[No. 7680.]

SPEER ET AL. V. THE PEOPLE.

1. CONSTITUTIONAL LAW—*Charter of Denver*—Article XX of the constitution providing that a certain percentage of the qualified electors of the city may petition the council for any amendment to the charter, and that the council shall submit it at a special election, when requested, to be holden within a specified limit of time, no provision being made as to the form of the petition, the procedure for ascertaining the sufficiency of the signatures, the form of submission, or of the necessary details, such details are proper subjects to be regulated and controlled by charter—(329).

2. ——*Amendment of the Charter*—*Power of the City Council*—Under sec. b of art. XX of the constitution the citizens of the municipality of Denver, so far as concerns municipal matters, have all the powers of the legislature. The power so exercised is legislative in its character, and is exclusively vested in them. The power is granted not to the citizens and the city council, but to the citizens only. And the power includes the power to initiate any proposed amendment to the charter. The petition for an amendment is part of the act of legislation, and the petitioners, in submitting their petition, are exercising legislative power; they who thus initiate the measure, and the whole body of electors who vote upon it, constituting the legislature of the municipality—(331, 332).

The proceeding is analagous to that provided by the constitution for the amendment of the fundamental law. The peti-

tioners stand in the same relation to the proposed amendment as does the general assembly to any amendment proposed to the constitution—(333, 334).

An assumption by the city council of authority to judge of any legislation proposed by such petition, and to refuse to submit it to the electorate, as required by the constitution, because it would be invalid if enacted, is an attempted exercise of legislative power from which the council is excluded by the express terms of the constitution. The council has no such authority. It is no part of its duty to inquire into the validity of the proposed measure. Its only duty is the ministerial one expressly prescribed by the constitution, to submit the proposed measure to the vote of the electors.—*Musser, White and Bailey, J. Js.*— (343-348).

The petitioners are entitled to the submission to the electors, of the measure which they propose, only in case they have petitioned in the manner prescribed, and for that character of legislation which, by the constitution, they are empowered to initiate—(350-351).

And the city council is vested with power to determine in the first instance whether what is proposed is within the constitutional prescription, and if not to refuse to submit it to the electors, their action being subject to review by the courts. And the courts in determining the propriety of the action of the council in such case, are not invading the functions of the legislative department, or interfering with the formative stages of legislation. Article XX of the constitution does not authorize the submission to the people, as an amendment, to the charter of what is in effect a new charter—(352-356).

The measure proposed as an amendment, in the present case, inasmuch as it changes the city council from a body composed of two houses, the members chosen from designated districts, to a single body of five commissioners chosen at large, so that all may come from one locality, denying to the mayor the veto of power now vested in him, reposing in the five commissioners all administrative powers which, by the existing charter, are vested in separate boards, commissions and officials, is not a mere amendment but an entire change in the plan of government which can only be ecected by a charter convention— (361-367).

Moreover, the proposed amendment consists of several distinct propositions, many of them entirely foreign to the proposed change in the form of government,—all to be submitted

as a single amendment. The elector is afforded no opportunity to vote for those which he favors, and against those of which he disapproves. He must vote for or against all—a form of submission in conflict with the letter as well as the spirit of our election laws, and condemned by an unbroken line of authority. *Gabbert J., Garrigues J., concurring*—(366-370).

The petitioners are entitled to have submitted to the electors of the city what the constitution provides shall be so submitted, and nothing more, and only in the manner provided for in the constitution—(372).

The city council are vested with authority and it is their duty, subject to review by the courts, to determine whether the measure proposed is one which, by the provisions of the constitution, may be submitted in this manner—(373, 377).

The designation given to the instrument by the petitioners is not controlling upon the council or the courts—(379).

This court should now determine the character of the instrument proposed and if it is not such a one as the council is authorized to submit in the manner attempted and if for this reason it would be invalid if adopted, the courts should not compel its submission. *Hill J.\**—(379).

3. ——*Power of the Courts*—While any proposed amendment of the charter of the city and county of Denver is pending, the courts have no power to inquire into or pass upon the effect or validity of the measure proposed—(387, 388).

When it has received the approval of the electors, and assumed a place in the charter, the courts may, when actual litigants whose rights are affected are before them, determine the validity and effect of the measure—and only then. *Musser, White and Bailey, J. Js.*—(388).

4. MANDAMUS—*When the Writ Issues*—When the municipal council, or any section or body thereof, of a city having by the constitution power to enact their own charter and from time to time to amend it, refuses to submit to the electors an amendment proposed in the manner, and by the number of electors prescribed by the constitution, it is the duty of the courts, by the writ of mandamus, to compel the performance by the obstructive body of the ministerial duty which the constitution imposes—(340-342).

——*Syllabus by *Hill J.*

*Error to Denver District Court.*—HON. JAMES H. TELLER, Judge.

·     Mr. H. A. LINDSLEY, Mr. THOS. R. WOODROW, Mr. N. WALTER DIXON, for plaintiffs in error.

Mr. EDWIN VAN CISE, Mr. H. B. TEDROW, Mr. W. H. MALONE, Mr. A. T. MONSON, Mr. W. H. BRYANT, for defendants in error.

Mr. JUSTICE MUSSER delivered the following opinion, in which Mr. JUSTICE WHITE and Mr. JUSTICE BAILEY concurred:

This writ of error was sued out to review a judgment of the district court, ordering that a peremptory writ of mandamus issue, requiring the respondents, who are plaintiffs in error here, to call a special election of the qualified electors of the municipality known as the city and county of Denver, and submit to the vote of such electors a certain proposed amendment to the charter of said city and county.

·  On November 22, 1911, there was filed with the clerk of the council of the city and county a petition that the amendment be submitted to the electors at a special election. In accordance with the provisions of the charter, the petition was transmitted to the election commission for examination. The petition was signed by 19,273 qualified electors out of a basic electorate of 47,371, and thus contained a sufficient number of signatures of qualified electors; and finding it so sufficient and that the form of submission asked for by the signers was in accordance with the charter, the commission certified the result of its examination and the form of submission. The petition was then filed with the clerk. The steps taken by the commission were all in accordance with the provisions of the charter, and that instrument provides that when a petition contains a sufficient number of signatures the commission shall file the same with the clerk,

who shall transmit it to the council, and the latter shall call the election at which the measure shall go upon the ballot under the form of submission certified by the commission.

On December 12, 1911, the board of supervisors, one of the two bodies forming the council, passed a resolution or bill calling the election for January 18th, but the other body, the board of aldermen, refused to do so and passed a resolution that it would not. Thereupon, the action for mandamus, which resulted in the judgment sought to be reviewed, was begun.

Before entering into the main question, it is sufficient to say, in answer to one contention of plaintiffs in error, that article XX of the constitution, pursuant to which the petition for the amendment is professed to have been made, says merely that a certain percentage of the qualified electors of Denver may petition the council for any amendment, and the council shall submit it at a special election, when requested, to be held not less than thirty, nor more than sixty days from the filing of the petition. No form of petition, no procedure for the ascertainment of the sufficiency of the signatures, no form of submission or other necessary details are provided for in the constitution. These, therefore, are all proper subjects to be regulated and controlled by charter.

The main contentions of plaintiffs in error are that the proposed amendment is in effect a new charter and not an amendment; that a new charter can not be submitted in this way, but only by and through the medium of a charter convention called and constituted as provided in article XX, and, therefore, the plaintiffs in error are under no legal duty to call an election and submit this so-called amendment; and, further, if the measure is amendatory of the charter it is in reality several different

amendments, which should be submitted separately on the ballot, and not as one amendment. So that in brief the contention of plaintiffs in error is that, in any event, the proposed amendment, if submitted and adopted, would be invalid for the reasons given, and, therefore, the council is under no legal duty to submit it.

The defendants in error, while combatting the contentions of plaintiffs in error and insisting that the proposed measure is in fact a charter amendment, contend that the council had no right to raise such questions; that its only duty was to submit the matter and that the courts have no power to control or superintend this proposed legislation, while in process of enactment. The district court held that the council had no right to raise the questions; that its one duty was to submit the proposed amendment, and refused to determine the questions raised. If the contention of defendants in error is right, a discussion and determination of the questions raised by plaintiffs in error would be altogether out of place. The principles which govern this case have already been settled by this court, and their application at this time will settle the matter so far as the courts are now concerned.

When the general assembly enacts a law, the general assembly is the legislature, (leaving out of consideration the question whether the governor is a part of it when he approves or vetoes an act.) When the general assembly proposes an amendment to the constitution, and it is submitted to and voted upon by the people of the state, the general assembly and the people are the legislature.—*People v. Mills,* 30 Colo. 262.

There is no doubt that the powers exercised by these legislatures in initiating, proposing, passing, voting upon and enacting laws and constitutional amendments are

purely legislative powers, and their exercise belongs to the legislative department of the government of the state. They are expressly provided for in the constitution.

Section 5 of article XX of the constitution expressly provides that, "The citizens of the city and county of Denver shall have the exclusive power to amend their charter or to adopt a new charter, or to adopt any measure as herein provided." The citizens of this municipality so far as concerns their local municipal matters, have all the powers of a legislature with respect to their charter.— *Denver v. Hallett,* 34 Colo. 393; *Londoner v. City and County of Denver,* 119 Pac. 156.

It must be borne in mind that the power thus expressly granted to the citizens of Denver is a legislative one and that it is exclusive in them. The power thus granted is plainly not executive nor judicial. It is a power to make laws, to legislate, and can not be other than legislative. To say that the power thus granted is not legislative would be as illogical and groundless as to say that the power of a court to hear and determine a cause is not judicial. As the power thus granted is expressly exclusive in the citizens, of necessity all other governmental agencies, departments, bodies and officers are excluded from exercising it. This exclusion is direct, positive and unequivocal. It is not a grant of power to the citizens and the council, or to the citizens and anyone else—it is to the citizens only. How can it be a power to the citizens only, or how can it be an exclusive power in the citizens if the council or any person or body other than the citizens are permitted to participate with the citizens in its exercise? There is not a word in section 5 of article XX or in any other part of the constitution that gives the council any right to participate in the exercise of this power. On the contrary, the council

is excluded from participating. To say that the council can participate with the citizens in the exercise of this power is in direct conflict with the language of the constitution, yet this is the very thing the council has attempted to do. It has assumed to itself the right to judge of this legislation and to say that it shall not be enacted because it would be invalid if enacted. At the stage in which the proposed legislation now is, such an assumption on the part of the council is nothing more nor less than the attempted exercise of a legislative power, from which the council is excluded in express terms. The citizens of Denver, being the exclusive grantees of this legislative power, must, in the exercise thereof, be regarded as though they formed a part of the legislative department of the state.

All matters of legislation must be begun, initiated or proposed before they can be finally enacted, and the beginning, initiation or proposal is as necessary to complete the legislation as the final enactment, for unless legislation is begun it cannot be completed by final enactment. Hence, the power given to the citizens of Denver to legislate includes also the power to begin or initiate legislation. The manner of doing this is expressly provided for in section 5 of article XX, immediately following the part quoted above, and it is there provided that a certain percentage of the qualified electors of Denver may petition the council for any measure, or charter amendment, or for a charter convention, and that the council shall submit the same, when so petitioned for, to the vote of the electorate of the municipality. The percentage of the electorate or citizens who thus initiate or propose or begin legislation for the citizens, and the electorate or citizens who are to vote upon it constitute the legislature of the citizens, and as has been seen the power

granted to this legislature is purely a legislative one.

In the enactment of a constitutional amendment proposed by the general assembly, the measure is first prepared and introduced in one of the branches of the assembly by some member; that house moulds and passes it by a sufficient vote; it is taken to the other house where it goes through the same process; it is signed at the proper time by the proper officers of the assembly and the state; it is lodged with the secretary of state, who causes it to be submitted to the people, and it is then voted upon, duly certified and lodged in the proper office. The constitution and law provide how each successive step shall be taken, the votes recorded, the number necessary in each house, by whom the bill or measure shall be signed, and other details. In the proposal of an amendment to the constitution each step must be taken as the constitution provides, yet while the measure is before it in process of legislation, the general assembly is the judge of whether the steps are being so taken and acts upon its judgment in taking them. These are all matters of legislative control and judgment while the enactment is in process of making. They are under the jurisdiction of the legislative department of government. There are two other departments of government, the executive and judicial. If either of these two attempts to directly superintend or control the general assembly in the matters referred to, it thereby assumes to have jurisdiction in these matters of legislation, and if permitted to prevail over the legislature then the judgment of the other department is substituted for the judgment of the legislature and the control and jurisdiction of the latter is ousted and it becomes subordinate.

The proceeding here with reference to the proposed amendment to the charter is analagous to the proceeding

to amend the constitution when proposed by the general assembly. Section 2 of article XIX of the constitution relates to the power of the general assembly to propose amendments to the constitution and provides how it shall be done. Section 5 of article XX gives to a certain percentage of the electors of Denver the power to propose any amendment to their charter, and provides how it shall be done; namely, by petition to the council signed by the requisite percentage of electors. The signers of the petition for an amendment to the charter stand in relation thereto substantially the same as the general assembly stands in relation to a constitutional amendment proposed by it.

As it is provided that the secretary of state shall do certain things which shall cause a constitutional amendment to be submitted to the vote of the people of the state, when proposed by the general assembly, so it is provided that the council shall submit to the vote of the people of Denver an amendment to the charter of Denver when the same is proposed by a petition signed by the requisite number of voters. This proposed amendment is in process of legislation, of making, and the legislature is now exercising its powers upon it. Now come the plaintiffs in error and ask the judicial department to directly intervene and to say to the legislature that the legislation it is at work upon is not what it is professed to be and can not be enacted in this way, and that if it is so enacted it will be invalid. They ask the courts to directly enter this field of legislation and assume to superintend and control this matter, substitute their judgment for the judgment of the legislature, and say whether the latter may or may not proceed further, and to thus subordinate the legislative to the judicial department and

to oust the grantee of an exclusive power from its exercise.

Under our form of government and our constitution this cannot be done. As has been seen, the power granted is exclusive. No person or collection of persons charged with the exercise of powers properly belonging to one of the departments can exercise the powers belonging exclusively to either of the others. The three departments are distinct and co-ordinate and each is supreme within the limits of its own sphere, and equally independent. Each within its own sphere may impose a restraint upon the other, as, for instance, the legislature may prescribe a mode of procedure that shall be followed by the courts, or the courts may, in proper proceedings where the rights of interested parties are affected, declare a law unconstitutional on account of the non-observance of a constitutional requirement in its passage, or a vice inherent in the law itself. But neither department has the right to leave its own sphere and assume directly a superior power over another when that other is in the exercise of its authority. In the case of *Frost v. Thomas,* 26 Colo. 223, this court said:

"Our state government is divided into three co-ordinate branches—executive, legislative and judicial—each of which, by the constitution, has its powers limited and defined. They are of equal dignity, and within their respective spheres, equally independent. This apportionment of power is an inhibition of the authority of one to exercise that which belongs to either of the others; and it is essential to the preservation of the autonomy of the government, that there be no encroachment of one department upon another; and to this end, the just limitations of the constitutional powers accorded each must be jealously guarded. The legislature may pass an act in

disregard of constitutional inhibitions, but the judicial department cannot directly interfere; the executive in the exercise of his constitutional prerogative, may veto it, or in failing to do so, the judiciary, in a proper case, may refuse to recognize it as controlling; but when the governor, in pursuance of his executive authority, recognizes an act as legal, and is proceeding to execute its provisions, the courts cannot directly interfere with the discharge of his duties under it, merely because it is alleged that such act is unconstitutional; otherwise, they would destroy those safeguards which are meant to be 'checks of co-operation, and not of antagonism or mastery, and would concentrate in their own hands something, at least, of the power which the people, either directly or by the action of their representatives, decided to entrust to the other departments of government,—*Sutherland v. The Governor,* 29 Mich. 320.

True, neither department can operate in all respects independently of the other, because each, within its own proper sphere, may impose a restraint upon the remainder; but neither can assume, directly, a superior authority over another, as each, in the exercise of their respective powers, stand on a constitutional equality; and if the judicial department of the state should attempt, in a proceeding of this character, to compel the chief executive to refrain from the performance of his duties, under the act creating the new county, it would be an usurpation of authority which alone devolves upon the executive branch of the state government to exercise."

In *People v. District Court,* 29 Colo. 182, each of the three judges who then composed this court wrote *seriatim* opinions, and Mr. JUSTICE GABBERT, who was one of the two concurring in the conclusions, in the course of his opinion on pages 204-205, said:

"When the question arises whether one department is encroaching upon the authority of another, the courts must become the final arbiters. When this question is between the judicial and either of the other departments, the judiciary must be just as careful in marking the line between their authority and either of the others as if the contest was one of power and authority between the other departments. By the constitution of the state our government is divided into three co-ordinate branches—legislative, executive and judicial. The constitution is the paramount law. Each department derives its authority from that source. The power of each is limited and defined. Each is clothed with specific powers. The result of this distribution of power is, that each stands on an equal plane; neither is superior to the other, and each acting within its proper sphere is supreme. Hence, neither can directly call the other to account for actions within its province, nor can one directly interfere with the other in the performance of functions delegated by the constitution. Any other rule would be an assumption that the authority of one was superior to the other, or that the departments were not of equal dignity. (Citations.)

To this doctrine each department must yield implicit obedience; otherwise, the constitutional authority of the respective branches of the government would be obliterated, and we would be confronted with the antagonisms and complications resulting from one department assuming to directly control the other with respect to acts within its province. It is only by a rigid adherence to these principles that the powers of each can be fully protected, or prevented from being assumed by, or concentrated in, one, and each limited to the legitimate functions which the people, by the constitution, have en-

trusted to the different departments of government."

In the case of *People v. Mills, supra*, the complainant sought to enjoin the secretary of state from publishing notices of the submission to the voters of amendments to the constitution proposed by the general assembly upon the ground that the proposed amendments were submitted without authority, were invalid and could not be upheld even though they should be voted upon and adopted. The secretary of state stood substantially in the same relation to the proposed constitutional amendments as the council stands to this proposed charter amendment. The relief sought was denied and the court said in the course of its opinion:

"Notwithstanding the constitutional authority of this court to issue injunctions, it cannot do so for the purpose of controlling action which it has no power to direct. In amending the constitution the voters become the body which finally give vitality to proposed amendments or refuse to make a change by rejecting them. The exercise of this power is as much a step in passing and considering proposed legislation of this character as any the general assembly must take in passing ordinary statute laws. The judicial department can no more interfere with such legislation or the successive steps necessary to be taken to amend the constitution than it can with the general assembly in the passage of other laws, because the judicial cannot directly interfere with the functions of the legislative department. The latter by the constitution is invested with the power of legislation in the exercise of which it is supreme, and no other branch of the state government can usurp this authority, or directly prevent the exercise of this power. In the first instance the legislative department must determine what laws shall be passed, what steps are necessary to that end, and the judi-

cial department can not investigate the validity of proposed laws or the regularity of the steps taken to effect their passage in a proceeding which would result in directly controlling the functions of that branch of the government to which has been delegated the exclusive power of legislation. When laws have been passed no doubt in a proper case the inquiry can then be made as to whether or not the requirements of the fundamental law in their passage or in their provisions have been observed, but in the first instance the body to which has been delegated the power to pass laws must be left untrammeled, to act in such matters as its wisdom may dictate."

In the Mills case this court cited *State v. Thorson,* 9 So. Dak. 149, in which case it was sought to enjoin the secretary of state from submitting to the voters an amendment to the constitution upon the ground that the amendment would be invalid if adopted. In the course of the opinion, the court said:

"Power to amend the constitution belongs exclusively to the legislature and electors. It is legislation of the most important character. This court has power to determine what such legislation is, what the constitution contains, but not what it should contain. It has power to determine what statutory laws exist, and whether or not they conflict with the constitution; but it cannot say what laws shall or shall not be enacted. It has the power, and it is its duty, whenever the question arises in the usual course of litigation, wherein the substantial rights of any actual litigant are involved, to decide whether any statute has been legally enacted, or whether any change in the constitution has been legally effected, but it will hardly be contended that it can interpose in any case to restrain the enactment of an unconstitutional law."

It is true that the cases referred to dealt with injunctions and that the courts, by refusing to enjoin ministerial agents of the legislature, thus aided the progress of legislation. The same principles, however, apply when such an agent refuses to perform his ministerial duty in connection with legislation in progress and the court is called upon to coerce the offending agent by the writ of mandamus. Every legislature at work upon legislation must necessarily employ certain agents or employes to perform acts that are ministerial, or that are mechanical in their nature. These employes or agents are no part of the legislature, but merely its agents. Their duties are not legislative, but ministerial. Their acts are necessary to further the progress of legislation. If such an agent refuses to perform his duties the legislation must halt until the legislature can substitute another agent who will perform the act, if the legislature may do that, or have recourse to some other power to coerce the offending agent to perform his duty. The general assembly may generally summarily remove such an agent appointed by it if he should attempt to block legislation by refusing to do his duty because he thinks the legislation is invalid or that the assembly is acting in a manner that it has no right to do, and another can be substituted who will do the work. When, however, for instance, the secretary of state, who is to publish a notice of submission, or a county clerk, who shall cause the form of submission to be printed upon the ballots, refuses to perform his ministerial duty because he thinks the measure would be invalid; the legislature at work upon the measure has no such summary remedy at hand, and unless it may call to its aid some other power, the legislation will be defeated. The only power that may aid the legislature in such a case is a court, with its writ of mandamus. The

only legal duty that the agent has is to do what the law enjoins when required by the legislature. It is not his duty to look into the proposed measure with reference to its validity. That is a legislative function. It is for the legislature to say whether, in its legislative discretion, a measure is valid for legislative purposes, and its decision is binding upon its ministerial agent. As far as he is concerned, when the measure comes to his hands it is a valid one and he can not be heard to say that it is not. His clear legal duty then is to perform the ministerial act required of him. If the legislature, acting within its sphere, exercises its discretion and determines that a measure is an amendment or is valid, that decision for legislative purposes is not only binding upon itself, but also upon its agents and upon every other department of government, while the measure is before the legislature. No other department can question it until within its own sphere and in the exercise of its own granted powers it may do so. This must be so, else the legislature would not have exclusive power and be a co-ordinate and independent department of government when acting within its own sphere. It would certainly be subordinate to and excluded by that department, body or officer that could directly enter the field of legislation and reverse the decision of the legislature. Courts have no more right to scrutinize the decision of the legislature on a piece of legislation in process of making, when an agent of the legislature refuses to perform a ministerial duty, than they have to scrutinize such a decision when the agent is about to perform such duty. As may be seen from the case of *Frost v. Thomas, supra*, the relation of the several departments of government is one of co-operation and not of antagonism. This being so, it is the duty of one to aid and not to impede another in the exercise

of its powers when the other is exercising its powers within its sphere. Courts are quick to resent any restraint which the legislature may seek to put upon them beyond its constitutional powers. The power of the courts is much enhanced by the fact that the executive department stands ready to co-operate in the enforcement of writs, processes and judgments. So then, it is the duty of courts, when called upon, to aid and co-operate with the legislature in the exercise of its functions either by granting writs of mandamus or refusing to grant writs of injunction as the aid sought may require.

In Dodd's Revision and Amendment of State Constitutions, p. 232, wherein the author clearly shows and approves the doctrine to which this court is already committed, it is said:

"The principle announced by the Colorado and South Dakota courts may be stated as follows: The courts have no power to interrupt the process of amendment before it is complete, to restrain a popular vote upon a constitutional proposal, even though they may be clearly of the opinion that the popular vote will be ineffective because of defects already apparent in the method of proposal. They must wait until the amending process is fully completed, and then pass upon the validity of the amendment if this question is properly presented in litigation before them. In accordance with this view it would seem that the courts should compel by mandamus administrative acts incident to the amending process; that is, the administrative acts should be treated as duties commanded by the constitution after the legislative proposal, which may be regarded as presumably valid and not subject to review in an *ex parte* proceeding. Under this view the courts may neither restrain the submission nor decline to compel it, because either of these is

direct interference with. the legislative action, the one positive in absolutely preventing submission, the other negative in that it does not enforce a purely ministerial duty in aid of the amending process."

The same doctrine was maintained and applied in a recent case in Oklahoma, *(Threadgill v. Cross,* secretary of state, 109 Pac. Rep. 558), wherein the court granted a peremptory writ of mandamus to compel the secretary of state to submit a constitutional amendment and refused to look into the question of whether or not it would be valid or invalid if adopted.   In the course of that opinion, after reviewing the authorities at length, the court said:

"In the procedure for amending the constitution of this state, which can only be effected by an election thereof, it becomes necessary for the people of the state to call into their service certain of their executive officers, and require them to perform certain ministerial duties. If the placing of such duties upon such ministerial officers gives in turn to them the right and power to question the validity of any or all the amendments proposed, and to refuse to act when they decide that any such proposed measure will be invalid, then the most subordinate ministerial officer of the state having any duties to perform in connection with such an election may himself do indirectly that which he could not have, nor any other citizen of the state have the courts do by proceeding instituted for that purpose, to wit, pass upon the validity of the proposed measure and stay the election by a judicial decree, if it be determined that the proposed measure is invalid."

See also *Reeves v. Anderson,* 42 Pac. Rep. 625.

In the present case the council is such a ministerial agent of the legislature.   The proposed amendment to the charter has come to it in regular course of legisla-

tion. So far as the legislature has acted, that department has determined, for legislative purposes, that this is an amendment. So far as the council is concerned, it is a valid amendment. The council stands substantially in the same position that the secretary of state does when a constitutional amendment reaches him from the general assembly in the regular course of legislation. The council has but one clear legal duty to perform, enjoined by the constitution and the charter, namely to call an election and submit this amendment to the vote of the electorate of Denver. It has assumed unto itself legislative power and has questioned the acts of its principal. That principal, the legislature, not having power to depose its offending agent and substitute another who will do the work, appealed to the district court to aid and co-operate with it by compelling this agent to perform its duty. In such circumstances the district court could not do otherwise than to order the issuance of a peremptory writ of mandamus.

No other conclusion can be reached without overturning the prior opinions of this court and going contrary to the great weight of authority elsewhere. It may or may not be necessary, when this legislation is completed, for the courts, acting within their own proper sphere, to declare it invalid in a proper proceeding where the rights of interested parties are affected by it. That is true of all legislation, whether enacted by the people of the state, by the general assembly alone or in conjunction with the people of the state, presuming to act under constitutional powers, or by the people of municipalities, presuming to act under the power expressly granted in article XX of the constitution.

The promptings of expediency may suggest that a short cut be taken and that the validity of this proposed

legislation be now determined. As we have seen, this would involve a usurpation of power and would be a ruthless invasion of another and independent department. Expediency has been the mother of wrong, the alluring star to destruction through the ages. Courts dare not be moved by it, lest they become the puppets of the hour. Future possibilities, that a measure may be invalid and that money spent by the public for its enactment will be spent in vain, count for nothing in the presence of the overwhelming necessity of obeying the plain mandates of the constitution, and of keeping inviolate the distribution of powers as made until the people themselves, in their sovereign power, see fit to make a change. This proposed amendment is not yet adopted. The people of Denver, in their legislative discretion, may reject it if an election is ordered, and in such an event the judicial department would have held moot court over a matter that never existed. Not until the measure is adopted and made a part of the charter have the courts any power to determine its validity and then only when actual litigants, whose rights are affected, are before them. Speaking of these matters, the court, in *Threadgill v. Cross,* said:

..."We have not overlooked the argument that if the proposed amendment in the case at bar will be void because in conflict with any compact between the state and congress, authorized by the federal constitution, and if the secretary of state may not refuse to file the petitions, a great expense will be incurred to the people of the state in holding a useless election. The same argument could be applied with equal, if not greater force, to sustain the right of the courts to enjoin the enactment of any void act of the legislature; because it not infrequently happens that a legislature consumes much time and incurs much expense to the state in passing laws which they think to

be valid, but which the courts determine at the instance of some interested suitors whose rights have been encroached upon to be invalid. It may be that a government all of whose powers are administered by one department may be administered with less expense than a government of the kind existing in this state and in the other states of the Union, in which the powers are exercised by different departments; but, if so, it must be presumed that the people in adopting the present form of government did so with knowledge of that fact and notwithstanding preferred that the powers of their government be administered by these separate and independent departments, and that the legislative department be given power in the first instance to determine what laws shall be passed, leaving it to the other departments to question or determine the validity of such laws only when they come to be enforced against some one whose rights they affect. The people of the state in the exercise of their legislative power to amend the constitution have not yet expressed their opinion upon the proposed amendment. They will do that at the election to be held thereon. If in the exercise of their legislative discretion they conclude that the proposed amendment violates any valid compact with the federal government or any provision of the federal constitution, they will no doubt in the observance of the duties of good citizenship, for that reason alone, reject the measure. If, on the other hand, they determine it to be a valid measure and adopt it, then, and not until then, will the judicial and executive departments have the power and duty devolving upon them to determine its validity and enforce its provisions."

Extreme and ludicrous examples of what may be done by the people of Denver in the exercise of the power thus given them in the constitution are suggested

by plaintiffs in error as reasons why the courts should take unto themselves superintending and controlling power. Such argument if heeded would result in the overthrow of our government itself, for each department may do extreme and ludicrous things in the exercise of its power. The general assembly may do extreme and ludicrous and even venal things in the exercise of its power, but that furnishes no reason for courts to superintend and control it. The governor may do ludicrous things, and with the military of the state commit cruel and unjustifiable acts, but that does not give the courts the right to control him in the exercise of his power. The courts themselves may do ludicrous things, may enter up judgments that are manifestly unjust, may construe a statute so that which is plainly white may be made to appear black, and yet the doing of any or all of those things would not give the governor the right to control and overawe the court that did it with his military power. The people, the governor, the general assembly and the courts may make mistakes at times; but we are bound to presume that with sense and patriotism they will endeavor to exercise the powers given them, and it is only by such faith in our institutions that our form of government can be made to endure.

By the distribution of powers as made, the courts themselves, when called upon to act, in appropriate proceedings where the rights of interested parties are concerned, become the final arbiters to determine whether one dpartment has invaded the province of another. To preserve this form of government in the distribution of powers, to enforce the plain mandates of the constitution and to act as just arbiters, the courts must be as jealous to guard against the usurpation of power by themselves

as to guard against such usurpation by either of the other two departments.

Having reached the conclusion that it was the duty of the council to submit the proposed legislation to a vote of the people, and that neither the council nor the courts have the right to intervene at this time, no opinion is expressed on the questions raised by plaintiffs in error as to the validity of the matter proposed for adoption.

The judgment should be affirmed.

Mr. JUSTICE GABBERT delivered the following opinion:

Defendants in error, relators below, and others presented to the council of the city and county of Denver a petition to submit at a special election to the qualified electors of the municipality what was designated "An Amendment" to its charter. It covers several closely printed pages, and purports to add twenty new sections to the charter, to change twenty-nine, and repeal nineteen. The petitioners requested that it be voted upon by answers to the following questions: "For the Non-partisan Commission Form of Government for the City and County of Denver," "Against the Non-partisan Commission Form of Government for the City and County of Denver."

The board of supervisors passed an ordinance, ordering the election as requested, but the other branch of the council, the board of aldermen, refused to do so. Relators then commenced an action in the district court against respondents, the purpose of which was to compel the council to submit the proposed amendment at a special election. The judgment of the court was in favor of relators, requiring respondents to call a special election for the purpose requested. Respondents have brought the case here for review on error.

It is not necessary to give a detailed synopsis of the pleadings, as, from the briefs of counsel it appears that the facts to which we have referred and shall refer to in the course of the opinion, present the question : Has the council any authority to determine whether legislation which the people may initiate by petition is of the character which may thus be initiated, and if it is not, can that body lawfully refuse to submit it? If this question is answered in the negative, that is the end of the case. If, however, it be answered in the affirmative, then it appears that one or more of the following questions are also presented :

1. Can a new charter be proposed by petition? .

2. If not, is the proposed amendment in effect a new charter?

3. Does the proposed amendment embrace several distinct amendments?

4. If it does, can a proposed amendment which embraces several distinct amendments be legally submitted as one in such form that it can only be voted for or against as a whole?

5. Can the council lawfully refuse to submit such an amendment in that form?

Section 5 of article XX of the constitution is as follows :

"The citizens of the city and county of Denver shall have the exclusive power to amend their charter, or to adopt a new charter, or to adopt any measure, as herein provided. It shall be competent for qualified electors, in number not less than five per cent. of the next preceding gubernatorial vote in said city and county, to petition the council for any measure, or charter amendment, or for a charter convention. The council shall submit the same to a vote of the qualified electors at the next gen-

eral election, not held within thirty days after such
petition is filed; whenever such petition is signed
by qualified electors, in number not less than ten
per cent. of the next preceding gubernatorial vote in said
city and county, with a request for a special election, the
council shall submit it at a special election, to be held not
less than thirty days nor more than sixty days from the
date of filing the petition; *provided,* that any question so
submitted at a special election shall not again be submit-
ted at a special election within two years thereafter."

From this section it appears without question that
the authority of the people to initiate legislation by peti-
tion is limited to that prescribed, and must be initiated
in the manner required. If they should undertake to ini-
tiate legislation which they have no authority to initiate,
or do not follow the steps prescribed, their action would
certainly be futile; consequently, it is only when they have
acted within the authority conferred and in the manner
prescribed, that their right to have proposed legislation
submitted attaches. The part of section 5 above quoted
does not confer upon the council any authority to amend
the charter or to take the initiative to propose to the elec-
tors an amendment thereto, or a proposal for a charter
convention; but the authority of that body to act in these
matters can only be exercised when invoked by petition
of the electors. Such is the express provision of a fur-
ther clause in section 5 which says: "No charter, charter
amendment, or measure adopted or defeated under the
provisions of this amendment, shall be amended, repealed,
or revised, except by petition and electoral vote." Has
the council any power, then, to ascertain whether its
authority to act has been legally invoked or a duty legally
imposed when a petition for proposed legislation is pre-
sented to it, or must that body, as contended by counsel

for relators, submit it without question, and without regard to what it, in fact, is?

Right and duty must both exist before one claiming the authority to require another to do a specified act can impose upon the latter the duty to perform that act. The right of electors to have proposed legislation submitted at an election does not attach unless they have petitioned in the manner prescribed for that character of legislation which they are empowered to initiate. The section above referred to says that when a petition for an amendment . is presented to the council, properly signed, the council shall submit it to the electors; but this duty is not imposed unless the right of the electors to have it submitted has attached, for it is not anything or everything which electors may present to the council that the latter shall submit, but only the legislation or steps which they are authorized to initiate in a specified manner. What, then, is the authority of the council in the premises? The fact that electors are limited to the legislation and steps which they can initiate in a specified manner, coupled with the further one that a petition by electors for proposed legislation to be submitted at an election must be addressed to the council, presupposes that it is its duty to ascertain, from an examination of the petition and the legislation thus proposed, whether its power and authority in the premises have been legally invoked. If the petition embraces that which the people have no right to have submitted to the electors, who must determine that? Clearly, the council, for it is the one to which the petition is addressed, and no other body is designated to determine it. The constitution expressly inhibits any question submitted at a special election from being again submitted at a special election within two years from the date it was voted upon. Who must determine whether or not an

attempt is being made to violate this inhibition? It must be given force and effect. Its purpose was to prevent the expense entailed in holding a special election by again submitting a question once voted upon until the expiration of a specified period. If the council has not the power to determine whether a question once voted upon is not the same question, then the inhibition is useless.

The petition must be signed by a specified per cent. of voters. If, upon investigation, it was found that the requisite number had not signed, then the council would clearly have no authority to act, and it would be its bounden duty to refuse to do so. Who must ascertain this fact? Clearly, the body to which the petition is addressed, which imposes no duty upon it unless signed as section 5 requires. The present charter provides that the election commission shall ascertain whether or not a petition for proposed legislation is signed by the requisite number of legal voters; but that does not change the situation. It is merely a provision whereby authority has been delegated to another body to advise the council on the question of whether or not the petition is properly signed.

Courts are bound to assume that in adopting a law those adopting it meant to accomplish some rational and sensible purpose; and must, if possible, discover and effectuate that purpose. *Edwards v. D. & R. G. R. Co.,* 13 Colo. 59 (63). Neither will the courts impute to the framers of a law the incorporation therein of something which is foolish or useless, if such imputation can be rationally avoided. *In re Funding of County Indebtedness,* 15 Colo. 421.

By requiring a petition to be addressed to the council it will not be presumed that this was intended to be a foolish and useless provision, but that the object was to

accomplish some rational and sensible purpose. Given a construction to the effect that the council was not thereby authorized to determine whether or not the legislation thus proposed was within the province of the petitioners to initiate, would render it useless, and lead to absurd results. Under such a construction, a petition addressed to the council headed, as in the case at bar, "That the charter of the city and county of Denver be, and the same is hereby amended by the following amendment," although what followed was, and in express terms purported to be an amendment to the constitution of the state, or the charter of the city of Pueblo, or was simply an almanac, the council would be compelled to submit it. Of course, these are extreme examples of what the result would be to deprive the council of all power and authority in such matters, but illustrate the absurd results which would follow the construction that the council must submit to the electors without question anything presented to them by parties purporting to act under the provisions of section 5.

Calling a special election incurs a great expense. The citizens of Denver are accorded the privilege of initiating certain legislation. They are limited to that specified. To prevent unnecessary expense, and avoid the complications which would result from initiating, and possibly having adopted by a vote, legislation which can not be legally adopted in this way, it is evident the purpose of requiring a petition to be addressed to the council was to give that body the authority in the first instance to determine whether or not the petition embraces matters which the people can initiate. If it did not, the council should refuse to submit it to the voters at either a general or special election.

; :: Counsel for relators rely upon *People v. Mills,* 30 Colo. 262, in support of their contention that the council has no discretion or authority in the premises other than to submit the measure petitioned for to the consideration of the voters. We do not recede one iota from what was decided or said in the Mills case; but it has no application whatever to the case at bar. In the Mills case it was decided that the unequivocal duty of the secretary of state was to publish notice of the submission to the people of the proposed amendment to the constitution, which is now article XX, and he had no discretion in the matter, whatever. No petition was addressed to him on the subject. The proposed amendment was initiated in the general assembly, and it was the duty of the secretary of state to give the required notice of its submission. To enjoin him from doing so, as this court was requested, would not only have resulted in inhibiting him from performing an official duty, but determining that legislation in its formative stage was either valid or invalid. That case, however, is entirely different from the one at bar. Here the council is vested with authority to determine whether or not that which is submitted to it by petition for submission to the people at an election is what the people may thus initiate, whereas, in the Mills case, the secretary of state was not vested with any authority or discretion whatever to determine anything with respect to an amendment proposed by the general assembly. This constitutes the distinguishing feature between that case and the one at bar.

Neither do we recede one jot from the doctrine which this court has often announced, to the effect that each department of government derives its authority from the organic law; that each stands on an equal plane, and is of equal constitutional dignity; that each, acting with-

in its sphere, is supreme; that neither can directly call the other to account for actions within its province; nor can one directly interfere with the other in the performance of functions delegated by the constitution; and that the people, when exercising legislative functions which they are empowered to exercise, constitute a legislative branch of the government; but none of these propositions have any application whatever to the case at bar. Article XX limits the legislation which the electors of the city and county of Denver may initiate. They must, by that article, address a petition to the council to submit such proposed legislation. That body is vested with the power to determine whether or not legislation so proposed is that which may be initiated by petition. If it is not, then it is the duty of the council to refuse to submit it. If its determination is wrong, the petitioners, by an appropriate action, can compel the council to submit it. In such an action the court determines whether or not the judgment of the council was right or wrong. By determining this question the court is not exercising a function which belongs to the legislative department, nor is it arresting legislation in its formative stage, but determining whether that body to which the petition to submit proposed legislation is addressed, in this instance the council, has determined a question, right or wrong, which article XX has vested it with authority to determine. If wrong, its judgment will be set aside, and it will be ordered to submit to the voters the legislation proposed. If right, its judgment will not be disturbed.

In brief, our conclusion upon the question under consideration is, that petitioners for legislation which may be initiated in this way must show a right to thus initiate it before any legal duty is imposed upon the council to submit it, and that the latter has the authority to deter-

mine, in the first instance, whether the duty to submit it has been legally imposed.

The main purpose of article XX was to vest in the people of the city and county of Denver the authority to control and provide for governmental matters local in their nature. To this end, by section 4 of the article, it provides how the first charter should be framed for submission to the people in the newly created municipality, which was by a convention composed of delegates chosen by the people. Recognizing that changes in the fundamental law of the municipality as first adopted would become advisable, section 5 of the act first provided that "The citizens of the city and county of Denver shall have the exclusive power to amend their charter, or adopt a new charter, or to adopt any measure as herein provided." Restraint on this power and a prescribed procedure to be followed in exercising it were necessary; consequently, the very next paragraph provides how the initial steps to effect any change in the charter may be taken in the following language:

"It shall be competent for qualified electors in number not less than five per cent. of the next preceding gubernatorial vote in said city and county to petition the council for any measure or charter amendment, or for a charter convention."

Does this authorize the submission of a new charter proposed by petition? We think not. The authority of the citizens of the city and county of Denver to initiate legislation is limited to the matters specified, and can only be exercised in the manner prescribed. It is delegated power or privilege conferred upon them by the people of the state, and is, therefore, limited to the objects for which it was given, is measured by the terms under which it was conferred, and cannot be extended by them

or enlarged beyond these terms; consequently, they have no authority to initiate any legislation or take any steps by that method except as the power delegated to them confers authority to do so. *Livermore v. Waite,* (Cal.), 25 L. R. A. 312. It will be observed that what may be initiated by petition is "any measure or charter amendment, or for a charter convention." As applied to a legislative act, "measure" does not mean the act itself, but the particular purpose for which it was enacted. To illustrate—suppose an amendment should be initiated to regulate the speed of automobiles, street cars, or other vehicles, in the streets of the city of Denver. It would be spoken of or treated as a police measure; or should one be proposed the purpose of which was to provide food, clothing or shelter for the poor, at public expense, it would be spoken of as a measure for the relief of the poor. In the Century Dictionary, after giving a definition of the word to be "a determinative action or procedure intended as means to an end; anything devised or done with a view to the accomplishment of a purpose," the definition is followed with an illustration to demonstrate the meaning given, as follows: "Specifically, in later use, any course of action proposed or adopted by a government, or a bill introduced into a legislature, as measures (that is, a bill or bills) for the relief of the poor; a wise measure; rash measures." To the same effect is a definition and illustration given by Webster, defining and illustrating the meaning of the word, as applied to legislative enactments, where it is defined to be "a step or definite part of a progressive course or policy; a means to and end; an act designed for the accomplishment of an object; as political measures; prudent measures; an inefficient measure." In other words, the term, as applied to legislative enactments, means their character, with re-

spect to the purpose for which they are enacted. . . ,

.. ,Certainly, none of these definitions, or illustrations by standard authorities, can be distorted into meaning that a measure would include a new charter, but was intended to include an amendment, having for its object some specific purpose. In the absence of words indicating a contrary intent, it must be presumed that terms employed in a legislative enactment are used according to the definitions given by the standard authorities, and that the body enacting a law intended to use words in their known and commonly accepted signification.—*Stermer v. La Plata Co:*, 5 Colo. App., 379 (385).; *Kennedy v. The People,* 9 Colo. App., 490 (493).

Applying this rule, it is clear that by the employment of the word "measure," it was intended to use it in the ordinary signification of the term. .

. The next term is "amendment," which, as applied to legislative enactments, means, according to the Century Dictionary, "An alteration of a legislative or deliverative act, or in a constitution; a change made in a law, either by way of correction or addition." Clearly, changes effected in this manner would not embrace an entire change in the law proposed to be amended by the submission of a new charter.

. . The final term is "charter convention," which, of course, can mean nothing else than the initiation by petition for the calling of a convention to frame and submit a new charter. .

. .Further provisions of article XX render it clear beyond dispute, that neither amendment, nor measure, confers authority to submit a new charter.

By the next paragraph following the one just considered we find that "Whenever the question of a charter convention is carried by a majority of those voting there-

on, a charter convention shall be called through a special election ordinance, as provided in section four (4) hereof; and the same shall be *constituted* and held, and the proposed charter submitted to a vote of the qualified electors, approved or rejected, and all expenses paid as in said section provided." Turning to section 4 we find that it was there provided that the first charter convention should be constituted by "*the election of twenty-one (21) tax payers, who shall have been qualified electors within the limits thereof for at least five years.*" Considering the two provisions together, it is made plain that a new charter could only be framed by those possessing the qualifications of tax payers and electors for the period of at least five years. Manifestly, from these provisions, it appears, by necessary implication, that a new charter can not be framed and submitted by those not possessing the qualifications prescribed in section 4, although initiatory steps with respect to matters prescribed in section 5 may be taken by qualified electors, whether tax payers or not, and without regard to the length of time they have been such electors. "Constitutional inhibitions, arising by implication, are as effective as though couched in express language."—*City of Denver v. Hiatt,* 28 Colo. 145.

There is an additional reason why a new charter can not be formulated by petition. Two rules of procedure are prescribed by article XX for changes in the charter, one for amendments and the other for a new charter. Should it be held that a new charter could be submitted by petition, under the provisions relating to amendments, then the two provisions are antagonistic, or one would nullify the other. By limiting legislation which can be initiated by petition to amendments, as section 5 clearly requires, the two provisions are rendered harmonious:

While not controlling, it is instructive to refer to article XX as printed in 3 M. A. S., Rev. Supp. It is a matter of common knowledge, that the learned author of that work was the reputed author of article XX. In the volume mentioned, in indicating the purport of the paragraph, in section 5, relating to what matters may be initiated by petition, there appear, as catch words preceding the paragraph: "PETITION FOR CONVENTION OR AMENDMENT," thus indicating that the author construed the paragraph to limit petitions to amendments and for charter conventions.

An amendment as, in effect, defined in the Century Dictionary, is an alteration of a legislative act, or in a constitution, by way of correction or addition. It means, as the term implies, an addition to, or modification within, the lines of the law thus to be changed or modified. If what is proposed as an amendment in effect changes the entire plan of the law which it is thus proposed to amend, it cannot be said to be an amendment, although part of the original may remain. That the effect of the amendment proposed does change the entire plan of the present charter cannot be better demonstrated than by reference to the submission clause formulated by the petitioners themselves, which reads: "For the non-partisan commission form of government for the city and county of Denver." "Against the non-partisan commission form of government for the city and county of Denver." In other words, according to their own designation, it is not proposed to amend or repeal specific sections of the present charter, but, by the amendment, create for the city and county of Denver, as its organic law, a commission form of government—something entirely new and distinct from the government formulated by the present charter.

A comparison of the present charter with the proposed amendment, shows without question that the latter, if adopted, changes the form and plan of the former to such an extent and in such a manner as to render the charter, if the amendment should be adopted, in effect, a new one. That cannot be accomplished indirectly which the law directly prohibits. This rule applies to the people with the same force and effect that it does to an individual.

The present charter provides for a representative government. Members of the council are elected from designated divisions, thus insuring every part of the city a representative in that body. The proposed amendment does away with this provision, and the members of the commission are to be chosen at large, and hence, may be selected from one locality. The present council consists of two branches, one acting as a check upon the other. By the proposed amendment, the council will consist of but one body.

The present charter provides for a legislative and an executive department, with the power of veto vested in the mayor. The latter is elected by the people for a specified period. By the proposed amendment, the mayor is selected by the members of the commission, but has no power of veto, and the powers and duties of the legislative and executive departments are vested in one body, composed of five members. It is not necessary to go through all the provisions of the charter, and the proposed amendment, and point out the radical changes which will, in effect, change the entire plan of the former along the lines indicated, but a few excerpts and references will illustrate the nature of such changes.

Section 3 of the charter provides: "The city and county is hereby divided into seven (7) supervisor dis-

tricts, and, for all the purposes of membership in the board of supervisors, wards numbers fifteen (15) and sixteen (16) shall be known as District Number One." It then designates what wards shall comprise the remaining districts.

Section 4 provides: "All legislative powers conferred by the constitution upon the city and county, except as otherwise provided, shall be vested exclusively in a council, consisting of a board of supervisors and a board of aldermen. The board of supervisors shall consist of seven (7), including a president, to be elected as herein provided, and all members of the board of supervisors shall be elected by the city and county at large; provided, however, that there shall be one supervisor from each supervisor district, and no person not a resident of the supervisor district from which he is elected, shall be eligible for membership in the board of supervisors."

Section 7 provides: "The board of aldermen shall consist of not less than sixteen (16), nor more than twenty-one (21) members, to be elected from wards, one from each ward of the city and county, * * *."

By division 1 of the proposed amendment, section 4 of the charter is to be amended so as to read as follows:

"All legislative powers possessed by the city and county, except as otherwise herein provided, shall be vested in a council of five commissioners, who shall each receive a salary of five thousand ($5,000) dollars per year, to be elected at large by the qualified electors of the city and county, for the term of four (4) years, and until their successors are elected and qualified, except at the first election, they shall be elected for the terms hereinafter provided."

By division 4 of the proposed amendment, section 10 of the charter is to be amended so as to read as follows: "The council shall select one of its members as mayor, removable at will, who shall be its presiding officer; but have no power of veto."

Section 16 of the charter is as follows: "Whenever an executive or administrative function shall be required to be performed by ordinance, the same shall be performed by the proper executive department and not by the council."

Section 24 of the charter provides that "The executive power of the city and county shall be vested in a mayor, sheriff, treasurer, auditor, attorney, clerk, assessor, recorder, coroner, county superintendent of schools, and in the departments and commissions herein created." It is proposed to amend this section by division 8 of the proposed amendment so as to vest in the commissioners, council, auditor, election and civil service commissions all executive, administrative and other powers now vested in the boards, commissions, and officials provided for in the present charter, and divides what it terms the executive and administrative powers of the city and county of Denver into five departments, as follows: "(1) department of public affairs; (2) department of finance; (3) department of safety; (4) department of public improvements; (5) department of public property. Each commissioner shall have charge of the department above named indicated by his official title,    *    *    *."

The section under consideration then provides what shall be the duties of each commissioner; that is to say, the commissioner of public affairs shall exercise the powers and perform the acts and duties now required to be performed by the county clerk and recorder of deeds; county superintendent of schools and coroner, and in

addition shall exercise and perform the duties of clerk, recorder, and several other offices designated. The commissioner of finance is to perform the duties of county treasurer and the county assessor. The commissioner of safety becomes the sheriff, and in addition, shall perform all the duties of the department of fire, police and excise, composing the fire and police board.

From these excerpts and references it plainly appears that the present charter of the city and county of Denver provides for two independent departments, executive and legislative. The proposed amendment concentrates these departments into one. The five proposed commissioners are to pass the ordinances and execute them. They levy the taxes and direct their expenditure. They are to discharge the duties of all officials, administrative or executive, like sheriff, treasurer, chief of police, and the various boards, as now provided by the present charter. In short, they are to perform all legislative and executive functions which were theretofore vested in, executed and exercised by, independent legislative and executive officials whose duties were defined by the respective departments to which these officials belonged—an entire change in the plan of government as it now exists under the present charter. Such is the interpretation given the proposed amendment by those who framed it. In their prefatory remarks they say:

"The legislative department vests all legislative power in a council of five members, elected at large, for a term of four years, instead of in the board of supervisors and board of aldermen, as at present. As members of the council are also commissioners, charged with the executive functions of the city, and are required to devote all their time to the duties of their office, a salary of five thousand dollars per year is allowed each member.

One member is to be elected president, and has the title of mayor."

 This is a change which does away with the separate executive and legislative departments as now established by the present charter.   Suppose an amendment should be proposed to the constitution of the state, whereby five or any number of persons should be elected as a commission to perform and exercise the duties and functions of the executive and legislative departments, could it be successfully contended that such a proposed change was merely an amendment?   We think not; and yet such a change would be a no more radical one in the plan and form of government, as outlined by our constitution, than the proposed amendment is to the present charter.   The purpose of having independent departments of government is, that each, acting within its sphere, confines each to the functions which it is authorized to exercise, and thus serve as a check upon each other.   To concentrate these functions unto one is so entirely foreign and without the lines of the form of government provided by the present charter, that such a change can not be effected by an amendment.

According to the views of those framing the amendment, as set out in their prefatory remarks, it changes twenty-nine, and repeals nineteen, and adds twenty new sections, leaving three hundred and five sections of the present charter unchanged.   That this would be the result of the amendment, if adopted, does not establish that it is merely an amendment.   The sections which it is said remain unchanged merely define or regulate the duties of those charged with official duties under the charter, or relate to other matters, for the government of the municipality under the present charter, or as it would exist if amended as proposed.  The test to apply, and which has

been applied, is, that under the guise of an amendment, a government which has legislative and executive departments, each independent of the other, can not, by an amendment, be changed into one, wherein the powers and functions of both are concentrated into one, for the reason that it changes the entire plan, ground-work and out-line of the original. Such a change can only be effected by a charter framed by a convention consisting of delegates selected by the people, possessing the qualifications which article XX prescribes, and then adopted at a special election called for that purpose.

An amendment means a single proposition. It may have several provisions, and if they are germane to the purpose of the amendment it cannot be said to consist of several distinct propositions. If, however, such provisions, or any of them, are in no sense germane to the object of the amendment, but relate to entirely distinct and separate propositions, having no relation to the purpose of the amendment, such a proposed amendment must be regarded as embracing several amendments. True, the proposed amendment purports to be "an amendment," but whether it is one or more is not determined alone by what it is designated or purports to be, but what it, in fact, is. Conceding, but not determining, that many of the provisions of the proposed amendment relating to the election of commissioners, and defining their duties, would be germane to the creation of a commission form of government, it contains many others which are not, and have no relation thereto, whatever, but which the form of submission prepared by petitioners does not in the least respect indicate are embraced in the proposed amendment.

By division 16 it purports to amend section 131 of the present charter, by providing for the election of one

county judge; that there shall be a juvenile court, presided over by one juvenile judge. It prescribes the salary for each of these officials, their term of office, and when they shall be elected; and that the term of each of these officials shall continue until their successors are elected and qualified at the city and county election, in May, 1914, thus extending their terms of office about two years.

Divisions 17 and 21 purport to amend sections 141 and 167 of the present charter by abolishing the municipal court, and providing for the appointment of two justices of the peace by the commission, who shall have the jurisdiction theretofore exercised by the municipal judge, where, before, there were three elected by the people. It provides for what is termed the preferential system of voting. It provides that the election commission shall arrange election precincts and districts, instead of the council, as the present charter provides. It changes the civil service provisions in many particulars. It provides that the municipality may purchase and maintain a school farm where dependent children, through proceedings in the juvenile court, may be committed and cared for. In many other respects it embraces provisions wholly foreign to a commission form of government; and yet, if this proposed amendment is submitted, it can only be voted for or against as a whole.

The submission clause formulated by petitioners is "For the non-partisan commission form of government for the city and county of Denver," "Against the non-partisan commission form of government for the city and county of Denver." Under this form an elector has three alternatives: (1) To vote for all the propositions included in the proposed amendment collectively; (2) to vote against all of them collectively; (3) to abstain from

voting. If he wants to vote for one or more, and against the others, he is not able to do it.

Two or more proposed amendments may be submitted at the same election, provided that each may be voted on separately, so that each may stand or fall upon its own merits. Considering this identical question, it was said, in *Lewis v. Commissioners*, 12 Kan. 186, at page 214:

"But that is a very different matter from tacking two questions together, to stand or fall upon a single vote. It needs no argument to show the rank injustice of such a submission. By it, several interests may be combined, and the real will of the people overslaughed. By this combination an unpopular measure may be tacked on to one that is popular, and carried through on the strength of the latter. A necessary matter may be able to carry with it some private speculation for the benefit of the few. Things odious and wrong in themselves may receive the popular approval, because linked with propositions whose immediate consummation is deemed essential. It is against the very spirit of popular elections."

Our constitution, article II, section 5, provides that "All elections shall be free and open." The purpose of that provision in our fundamental law was to secure freedom of choice by voters, not merely between parties, but also in respect to every office to be filled, and every proposition submitted to the electors for their consideration and determination. As was said in the Kansas case, above referred to:

"A voter at a state election would be shocked to be told that because he voted for a person named for governor on one ticket, he must vote for all the persons named thereon, or that voting for one person, he was to be understood as **voting for all.**"

And yet, in principle, that is the position in which the electors of the city of Denver are placed, in voting on the proposed amendment; that is to say, they must either vote for or against it as a whole, when it might be that they desired to vote against some of the propositions which it embraces, but for others. A voter might be in favor of a commission form of government, but opposed to the provisions relating to the county and juvenile courts, and the extension of the term of office of the present incumbents; or to the provision abolishing the municipal court, and providing for the appointment of two justices of the peace upon whom the jurisdiction is conferred theretofore exercised by the judge of the municipal court, when before there were three justices of the peace elected by the people; or he might be opposed to the preferential system of voting, or to the election commission creating election precincts, or the proposed changes in the civil service, or with vesting the municipality with authority to purchase and maintain a school farm, or *vice versa;* or he might be opposed to the commission form of government, and in favor of some one of the other provisions, but opposed to others; and yet he is given no opportunity for choice between the different propositions. If he desires to vote for any, he must vote for all; and he is thus placed in the position that if he favors one, but opposes others, he must, in order to vote for that which he desires, vote for that which he opposes; or, to otherwise state the situation, if he is opposed to some of the propositions, but favors others, he must, in order to defeat those to which he is opposed, also defeat those which he favors.

That two or more propositions can not be united in a submission to electors in such manner as to deprive them of the right to exercise their choice by voting for or

against each separately, is settled by practically an unbroken line of authorities; but we need not go outside of our own adjudications on the subject. In *City of Denver v. Hays*, 23 Colo. 110, it was held that if several propositions are submitted as an entirety, it is clear the voter can not vote for one and against the other; and that such a submission is in conflict with the letter, as well as the spirit, of our election laws, which require that in all elections the people must be given an opportunity to openly and fairly express their choice, and a submission in form which prevents their freedom of choice is illegal.

In the *Hays* case *Gray v. Mount*, 45 Iowa 591, is quoted from, where it was said, in speaking of the plan of submitting several distinct questions which can only be voted for or against as one, that it "resembles more the common device of an auctioneer in disposing of worthless goods, whereby a good article is mingled with them and made to draw bids * * * rather than the open, direct and fair manner that always should prevail in elections by the people. The very letter, as well as the spirit, of our election laws condemns this plan."

The final question is, can the council lawfully refuse to submit a proposed amendment which embraces several distinct amendments having no relation to each other in such manner that it can only be voted for or against as a whole? Article XX does not prescribe how an amendment shall be submitted. If submitted by the council it must be submitted in a lawful manner, and that body can not be required, either by petitioners for proposed legislation or by the judgment of a court, to submit proposed legislation in a manner which would not be legal.

We do not determine that the proposed commission form of government would be valid or invalid. That question is not presented. On this subject what we do

determine, is, that what is, in effect, a new charter, can not be framed by petition for submission, but must be formulated by a convention of delegates possessing the qualifications prescribed by section 4 of article XX, selected by the people, at an election held for that purpose, and then submitted to the people at a special election for their adoption or rejection. Article XX guarantees to the citizens of the city and county of Denver the right to have a new charter framed by delegates selected by themselves in the manner therein prescribed, and they can not be deprived of that right by persons initiating by petition what is, in effect or in fact, a new charter. Article XX prescribes what legislation may be initiated by petition. None other than what is therein prescribed can be thus initiated. It may be that every provision contained in the proposed amendment is wise. With that we are not concerned. These are questions which the electors must determine for themselves when lawfully submitted for their adoption or rejection. Constitutional barriers can not be removed for the purpose of permitting legislation to be initiated by petition which the constitution inhibits from being so initiated, merely because it may be deemed expedient. If they are stricken down, the protection they were intended to afford can not be invoked in the future.

Our state constitution was created by the people themselves. It is in the nature of a contract which they have entered into with each other. They can no more violate this contract than individuals can violate theirs. They are not above this law, but are bound by its provisions. If it is not observed by the people or enforced, then it is of no avail, and the rights which it was intended to protect will be trampled upon with impunity. Its purpose was to place certain limitations upon the power vested in the people, and when they attempt to exercise

a power which they do not possess, or which is inhibited by the fundamental law which they have framed for their guidance and protection, their action will be nugatory. If, from experience, it appears that constitutional restrictions are irksome or not advisable, the remedy is to remove or change them by amending that instrument in the manner the law provides, and not by overriding or ignoring them.

The judgment of the district court should be reversed, and the cause remanded with directions to dismiss the proceeding.

The writer is authorized to state that Mr. JUSTICE GARRIGUES concurs in this opinion.

Mr. JUSTICE HILL delivered the following opinion:

I cannot agree with the construction given article XX of the constitution by which the judgment is affirmed. I do not think decisions pertaining to rules of procedure governing legislative bodies are applicable to this case. The legislature as a co-ordinate branch of the government derives its power from the whole people, which power, generally speaking, is plenary unless prohibited by the national or state constitution.

Our state constitution, except as to mandatory matters, is a limitation and not a grant of power. The reverse is the case here. The people of the whole state adopting article XX of the constitution granted or delegated to a part of the inhabitants of the city and county of Denver (by complying with certain prerequisites) the right to submit to the electors of the municipality a vote upon certain matters. This is a grant of power, and petitioners are entitled to have submitted, in this manner, what is provided by the constitution and nothing more.

Plaintiffs in error claim that the instrument presented for submission is not in fact an amendment to the charter of the city and county of Denver, but is a new

charter, which, under article 20, can only be submitted to a vote through a charter convention, as provided therein. If this contention is correct, then the judgment of the trial court places the council in the position of having to submit to a vote of the people any proposition upon any question, regardless of their duty or even authority, and regardless of whether, if adopted, it would be a nullity from lack of authority to submit it. I cannot concur in this contention. In the absence of language to that effect the mere name given to the petition is not necessarily controlling on the council or the courts. If this instrument itself shows that it is one that should not be submitted in that manner, it is the duty of the council to refuse to submit it, and the courts will not compel the council to do a thing they should not do.

It will be observed that the privileges given are not to enact any measure into a city law, it takes a majority to do that, but it is to submit and thereby procure or force an expression upon these propositions by the whole people of the city, hence to accept the construction contended for is to say that the people of the whole state adopting article XX granted or delegated to a small per cent. of the electors of Denver certain privileges heretofore unknown to the city's form of government and also vested them with the power to determine for themselves the limitation upon the privileges thus granted.

Let us see to what results the contention might lead. Article XX provides that any question submitted at a special election shall not again be submitted at a special election within two years. Suppose a certain question was submitted to a special election which resulted in the negative, and petitioners being dissatisfied within thirty days thereafter again petition and present the same proposition for submission. If the rule contended for is cor-

rect, then petitioners are the sole judges of their right to again have it submitted, at any time, regardless of the provision of the constitution.

The powers granted under article XX are limited to local municipal affairs; this court has repeatedly so held. To affirm this judgment for the reasons given is to say that five per cent. of the electors can present a petition upon any question they may desire to secure the expression of the electors of the municipality, by calling it an amendment to the city charter. This would compel an election upon the theory that they are the sole judges of the character of the instrument, and that the city council and courts had no voice in the matter. To illustrate, many citizens believe in national prohibition. If five per cent. of the electors of the city thought it desirable to secure by vote an expression upon that question for its moral effect, all that would be necessary would be to procure and present the necessary petition designating it an amendment to the present charter. Again, if they desired, through an election, to procure an expression concerning the treatment received by the Jewish people from the Russian government, all they would have to do would be to present a petition labeled an amendment to the city charter. Those believing in the single tax idea might desire that question submitted to the same kind of a vote. Quite a few inhabitants of the city are believers in the principles of socialism, and if this contention is to prevail I see nothing to prevent them, by a petition signed by five per cent. of the electors of the city labeled an amendment to the charter, from having it submitted to a vote. We might go on with illustrations indefinitely, but, to my mind, any one of these (although applicable to extreme cases) is sufficient to demonstrate that such was never intended by the adoption of article 20.

These illustrations are attempted to be answered by the statement, that the same principle is applicable to the legislature when submitting a constitutional amendment; that in this respect the power of submission is unlimited and cannot be questioned by the courts prior to the submission. The answer to this is the conditions are not the same. The constitution limits the number submitted by the legislature at any one election to six articles. The members of the legislature are elected for short terms, during which period, if their stewardship is not satisfactory to their constituency, they are usually, by the same power, retired to private life and others chosen whose views are in harmony with the majority. They are created by the people and are responsible to the people; they take an oath of office to perform their duties; but here the five per cent. are not elected and are responsible to no one for their action; their term for an abuse of the privilege (in case of such an abuse) is unlimited. Article XX does not provide for any test of good faith upon behalf of any one of the petitioners, or those representing them, that the thing proposed comes within the privileges granted.

It is said the illustrations made are unreasonable and ridiculous, when applied to the intent and purpose sought to be accomplished. But where is the line to be drawn, and who is to draw it? Experience, especially as shown in legislative bodies, teaches one to realize that certain questions which may be thought by one person to be unreasonable, or ridiculous, may, in the mind of another, be thought of vital importance as a matter of education to the people.

No cases have been cited directly in point. I think the logical conclusion is that pointed out by Mr. Dodd in his able work upon "The Revision and Amendment of

State Constitutions" wherein he states what the courts probably will do when the conditions, such as now exist here shall arise. At page 233, in commenting upon the difference between amendments proposed by the legislature and those referred by petition, he says, in substance, that this practical difference will probably incline the courts to take the view of the California court, (which has heretofore applied the rule to legislative bodies). He says that in states which have adopted the referendum it is probable that the courts will restrain the submission of a law improperly submitted. To illustrate he says:

"For example, if an Oregon law were proposed by initiative petition, but did not comply with the constitutional requirement concerning its title, we may expect that the courts should restrain the submission of the proposal to the people, on the ground that it is invalid, and that the popular vote would in any case be ineffective. This rule would have the advantage of obtaining a judicial decision upon the validity of a law at the earliest possible moment, but it has the disadvantage of having such a question passed upon in an *ex parte* proceeding, and of extending still further the judicial control over legislation. Yet, as has already been suggested, the judicial control over the processes of amendment and of popular legislation (by the referendum) will probably be established along the lines laid down by the California court."

In my opinion it is unnecessary in this case to go as far as the learned author states the courts will probably go upon this subject, for the reason that the question here to be decided is, whether the petitioners come within the privilege granted by the constitution. If they do, the council should be compelled to submit it to a vote; if they do not, then it is not their duty to submit it, and

mandamus will not lie to compel an official to perform an act which it is not his official duty to perform.  Petitioners must comply with the law which makes it the mandatory duty of the council to submit the matter to a vote.

I do not wish to be understood as saying that the council can refuse to act by questioning (in order to have tested in advance) the validity, if adopted, of an amendment, measure or new charter if properly submitted. What I mean to say is, in my opinion, if the thing proposed is not one which the constitution provides can be submitted in this manner, then the council have the right, and it is their duty, to raise the question and have it determined before submission.  It is the foundation of their authority to act.  If they refuse to submit it upon the ground that the constitutional requirement has not been complied with by the petitioners, the courts will not compel them to do so unless they find the constitutional requirements have been met.

I see no material distinction between this and other cases where the initiative is by petition; for instance, our irrigation district act provides that a certain number of resident freeholders may petition for the purpose of establishing an irrigation district.  It provides that the petition shall state the means proposed to supply water for the irrigation of the land embraced therein.  It further provides the effect to be given to the election held under such petition which may result in the creation of at least some kind of a quasi municipal corporation.  Suppose in such a case, though properly labeled, the substance of the petition disclosed that the district was to be formed for the purposes of building good roads, or any other reason foreign to the privileges granted in the act, would anyone contend that a board of county commissioners could be compelled to call an election for the creation of an irriga-

tion district for such a purpose? Or that they could not in the first instance question the right of the petitioners to decide for themselves whether the purposes stated come within the privileges granted?

Under certain conditions a board of county commissioners has the right to initiate and submit to a vote of the people of the county the question of contracting a bonded indebtedness for the purpose of constructing a court house. Assume under this authority by giving it the proper title they attempted to submit to a vote of the people, the question of bonding the county for the purpose of erecting a building in Chicago or Omaha, within which to store the products of the county, as a medium of advertisement, a thing in the minds of some commendable, and which possibly might be beneficial to the inhabitants of the county, yet under such circumstances would anyone question the right of any taxpayer to enjoin the holding of such an election?

It is urged that this line of reasoning applies only to the wisdom of article XX which we have no right to question. If it contained language justifying such a construction, I would concede the correctness of the position, but when I consider what is possible to be done under such a contention, I think before being justified in giving it such a construction we should surely know that article 20 specifically so provides in language beyond any reasonable contention. It not having done so, and being a grant of power, I cannot conceive that it was intended to give any power beyond that specifically stated, and I do not think we should read into it something not there and which to my mind is not implied.

The fact that article XX, in substance, provides that certain things can only be submitted in this manner, and further provides that the council shall submit only those

which are thus provided for, is conclusive that it was never intended to make the petitioners in the first instance, or at all, the sole judges of that question, but left it as many other questions are left, to be raised and passed upon by the council and the courts. If the instrument proposed is not one authorized by the constitution to be submitted in this manner, then the council had no more authority to submit it than they would if article XX had never been adopted. The council are certainly in no different position than any other officer upon whom is imposed certain official duties. When petitioned to perform an alleged duty it is elementary that they must, in the first instance, pass upon whether or not the act urged comes within the official duty.

In my opinion we should now decide whether this is an amendment, sundry amendments, or a new charter. If an amendment it should be submitted. If, in fact it is a new charter, we should determine whether article 20 of the constitution authorizes a new charter to be submitted in this manner, and if it does, then it should be submitted; on the other hand, should we find that it is a new charter and under article XX a new charter can only be submitted through a charter convention, then it was not the duty of the council to submit it in this manner and if we find this to be the case I think we should at this time so hold.

At the oral argument I understood one of the leading counsel for the defendants in error to say, that while the authorities appeared to be otherwise, yet if we could find a way to now decide whether the instrument was one which could be submitted in this manner, they would be glad to have us do so, as it would then settle that question, and, in case of its submission and adoption, would leave it free from future attacks for that reason. I can-

not agree that the weight of authority holds otherwise, but I do agree that we should decide this case now on its merits and not wait until after the election. In my opinion the whole controversy should be determined at this time; however, as a sufficient number of the court who join in the opinion which results in affirming the judgment think otherwise, I regard it improper, at this time, for me to express my views upon those questions. What I have said is without intending to express an opinion upon the questions of whether the instrument proposed for submission is a measure, an amendment, sundry amendments or a new charter, or whether a new charter can only be presented through a charter convention.

It is also urged by plaintiffs in error that this so-called amendment (if in reality it can be construed as amending the present charter) contains many amendments, and for this reason would be invalid if submitted as one amendment, following the well known rule that where the people have the right to express their choice upon each distinct proposition, this right cannot be defeated by submitting them in a manner to prevent such expressions. If it is to be submitted as an amendment or amendments, then I think this question material and one which should be determined at this time.

---

## ON PETITION FOR REHEARING.

*Per curiam:*

Mr. JUSTICE MUSSER, Mr. JUSTICE WHITE and Mr. JUSTICE BAILEY are of the opinion that, under the facts of this case, the duty of the city council to call a special election of the qualified electors of the city and county of Denver, and submit to a vote of such electors the proposition petitioned for, as a proposed amendment to the char-

ter of the municipality, is ministerial only and should be performed; and further, that the courts can not question or determine the validity of the proposed legislation until it becomes a finished legislative act.

Mr. JUSTICE HILL is of the opinion, that the city council is vested with authority, and it is its duty, to determine, subject to review by the courts, whether the proposed legislation is of the character for which the electors may petition under the authority and power vested in them by the constitution, and if not of such character, to refuse to submit the measure to a vote of the electors.

Mr. JUSTICE GABBERT and Mr. JUSTICE GARRIGUES are of the like opinion with Mr. JUSTICE HILL, and are also of the opinion that the council rightly refused to call a special election for the reason, among others, that the commission form of government proposed is, in effect, a new charter, and that a new charter can not be framed by petition, but must be formulated by a convention of delegates possessing the qualifications prescribed by section 4 of article XX of the constitution, elected by the people at an election held for that purpose, and then submitted to the people at a special election for their adoption or rejection.

As a result of the conclusions reached by the several members of the court participating herein, it necessarily follows, that the judgment of the district court stands affirmed by force of section 438, Code of Civil Procedure, R. S. The former *per curiam* opinion is withdrawn, and the motion for rehearing denied in accordance with the rule stated in *Ayers v. Bensley et al.,* 32 Calif. 632.

CHIEF JUSTICE CAMPBELL not participating.