# SUPREME COURT

OF THE

STATE OF COLORADO

SEPTEMBER TERM, 1913

[No. 8126.]

THE PEOPLE EX REL. MOORE V. PERKINS ET AL.

1. CONSTITUTIONAL LAW—*Article XX*, is a grant of power to the inhabitants of the city and county of Denver to do what it specifically states they may do, and what is necessarily implied from such express grant.

2. DENVER—*Amendment of the Charter*—Under secs. 4, 5, of art. XX of the constitution the inhabitants of the city and county of Denver are given the exclusive power to amend their charter, and are entitled to demand the submission of anything which falls within the definition of an amendment. A charter must be complete in itself, and a proposition for the amendment of twenty sections out of three hundred and sixty, for the repeal of twenty sections, and the addition of twenty sections, leaving approximately three hundred sections untouched; which is germane to the subject of municipal government; which fails to provide for the appoint-

(17)

ment or election of many officers and employes required in the existing charter, or their duties or salaries; which makes no provisions as to the civil service, the fire and police department, the management of municipal finance, public utilities, and the control thereof, the public health, franchises and public improvements, must be regarded as amendatory to the charter, and not as a new charter.

3. ——*Manner of Submission of Amendments*—At the same election were submitted (1) propositions for a commission form of government, in lieu of that before existing, and (2) a separate proposition for the election of commissioners to exercise the powers and discharge the duties prescribed by the first. The first proposition declared, as its final proposition, that it should not go into effect until an amendment to the charter should be adopted "providing for commissioners to assume the duties herein provided for, and designating the time when they should take office." *Held* that the circumstance that the adoption of the commission form of government was contingent upon the election of commissioners did not invalidate the measure.

The proposition for a commission form of government provided regulations concerning the legislative functions of the commissioners; declared that certain acts and certain omissions should be sufficient cause to declare a vacancy in the office of the commissioner; prohibited the exercise of the veto by the mayor; provided for a reduction in the number of certain other officials. The other proposition provided for a change in the time of municipal elections; prohibited political parties from naming candidates; and increased the term of office of the election commissioners provided for in the existing charter. *Held* that these several provisions were only parts of and incidents to the general scheme proposed by the amendments, necessary to a complete government under the commission form, and germane thereto, and although the existing charter provided that whenever any separate or alternative proposition for the amendment of the charter were to be submitted the ballot should be so framed as to enable the voter to express his intention in regard to each proposition, it was held that the substance of this provision was complied with, though the ballot was so framed that the voter was afforded opportunity to vote only for or against each of the two propositions as a whole, and not for or against any of the several distinct provisions thereof.

Though the official ballot was so framed as to disclose a strong partiality for the commission form of government, and to be in some sort in the nature of a campaign document, yet inasmuch as nothing appeared to show that any voter was misled by it, it was approved.

4. ——*Publication of Notice of Election Upon Charter Amendments*— The ordinance submitting to a vote of the people certain amendments to the charter was signed by the mayor and council January 24th, and was published January 25th. The text of the amendments, and a call for the election was published January 24th, January 31st and February 7th,

as required by the charter. It was contended that the first publication of the call for the election was a nullity, because the ordinance which fixed the date of the election was without effect, under the charter, until published. But the election being a special one and no provision being made, either by the constitution or the charter, that such an election must be called by ordinance (art. XX, sec. 5; charter, sec. 179), the call for the election, though contained in an ordinance, was held properly and effectually published in advance of the publication of the ordinance.

5. MAXIMS—*Surplusage Does not Vitiate*—When a thing is done in compliance with the mandate of the constitution, other things done at the same time in excess of the requirements of the constitution may be rejected.

6. EVIDENCE—*Judicial Notice*, taken that the commission form of government for municipalities has of late years been adopted in many cities of the United States.

7. COMMISSION FORM OF GOVERNMENT—*Municipal Corporations*, analyzed and its differences from the form heretofore commonly adopted set forth.

*Error to Denver District Court.*—Hon. JOHN H. DENISON, Judge.

Mr. C. H. REDMOND and Messrs. McKNIGHT & HENRY, for plaintiffs in error.

Mr. I. N. STEVENS, Mr. JOHN A. RUSH, Mr. JAMES A. MARSH, Mr. PAUL KNOWLES, and Mr. WILLIAM R. KENNEDY, for defendants in error.

Mr. JUSTICE HILL delivered the opinion of the court:

This is an action in *quo warranto* in the name of the People on Relation of Marcellus F. Moore. Its object is to test the title of the defendants in error to the offices of commissioners of the city and county of Denver. By this method it is sought to have declared void the enactments which purport to create the so-called commission form of government, and the nonpartisan system of election for this city and county. The trial court sustained the validity of these enactments, as well as the validity of

the election of the defendants in error as such commissioners under the nonpartisan system of elections provided for therein. There is no dispute concerning the facts. They disclose that a charter had been framed and was adopted by the people of the city and county of Denver in March, 1904, in conformity with the provisions of article XX of the state constitution. This charter provides for a board of supervisors consisting of seven members to be elected at large, also a board of aldermen of not less than sixteen nor more than twenty-one, to be elected by wards. It also provides for the election of a mayor and certain other executive and judicial officers, and for the appointment of certain other executive officers. In other words, it provides for a complete system of municipal government by what has heretofore been recognized as the mayor form, consisting of two legislative bodies, with a power of veto resting in the mayor, etc. The plaintiff in error, prior to the attempted change, was an alderman duly qualified and the term for which he was elected has not expired.

Upon February 14th, 1913, a special election was held within and for the city and county of Denver, at which were submitted, separately, by prior initiation of certain electors in the manner, so far as details are concerned, as provided for by the charter, two certain propositions in writing. Each was designated therein "Amendment to the charter of the city and county of Denver." One of these propositions by repeal of certain sections of the old charter, the amendment of others, and the adding of new sections, purports to make certain changes in the form of government from the mayor form so-called, as above described, to the commission form so-called, with five commissioners to take the place of the mayor and legislative council; they are also to perform certain other duties. The other purports, by the same method, to enact what is commonly known as the non-partisan system of

election; this includes what is called the preferential system of voting. The result of the election was for the adoption of each of these designated amendments, and the regular procedure provided for by the then charter appears to have been followed in declaring them adopted. Upon May 20th following, as provided for in one of the amendments, another election was held. This was conducted under what is termed the non-partisan system of elections as authorized in the other amendment. At this election the defendants in error, except James F. Markey, were, in the manner provided by this amendment, duly elected to the offices of commissioners. Mr. Markey was elected to the office of auditor, which had been created by one of the amendments. They all qualified and assumed to enter upon the duties of their respective offices. This resulted in the ouster of the plaintiff in error and certain other officers then holding certain offices in existence under certain sections of the old charter, which sections the latter enactments purport to amend or repeal.

It is claimed that these so-called amendments are invalid for the reasons following: First, that they constitute a new or revised charter, which could only be submitted or adopted through the medium of a charter convention. Second, that if they are amendments that the manner of submission to the electors was such as to afford no opportunity to the voters of lawfully exercising their right of franchise and that they were consequently not legally adopted. Third, that the call for the election at which they were submitted was not published as required by the constitution. If these enactments are amendments to the charter which was in existence at the time of their purported adoption, it becomes unnecessary to consider the question of how a new charter can be secured, for which reason we will first consider the question of whether they are amendments. The authority for the

adoption of the charter which these enactments purport to amend, as well as the manner in which it can be amended, is to be found in article XX of our state constitution. This court has repeatedly held that this article is a grant of power to the inhabitants of the city and county of Denver, and that it authorizes them to do what it specifically states they can do and such other matters as must be necessarily implied from the language used.

The material parts of sections 4 and 5 necessary to be considered in this controversy read as follows:

"Sec. 4. The charter and ordinances of the city of Denver as the same shall exist when this amendment takes effect, shall, for the time being only, and as far as applicable, be the charter and ordinances of the city and county of Denver; but the people of the city and county of Denver are hereby vested with and they shall always have the exclusive power in the making, altering, revising or amending their charter and, within ten days after the proclamation of the governor announcing the adoption of this amendment the council of the city and county of Denver shall, by ordinance, call a special election, to be conducted as provided by law, of the qualified electors in said city and county of Denver, for the election of twenty-one taxpayers who shall have been qualified electors within the limits thereof for at least five years, who shall constitute a charter convention to frame a charter for said city and county in harmony with this amendment. Immediately upon completion, the charter so framed, with a prefatory synopsis, shall be signed by the officers and members of the convention and delivered to the clerk of said city and county who shall publish the same in full, with his official certification, in the official newspaper of said city and county, three times, and a week apart, the first publication being with the call for a special election, at which the qualified electors of said city and county

shall by vote express their approval or rejection of the said charter. If the said charter shall be approved by a majority of those voting thereon, then two copies thereof (together with the vote for and against) duly certified by the said clerk, shall, within ten days after such vote is taken, be filed with the secretary of state, and shall thereupon become and be the charter of the city and county of Denver. But if the said charter be rejected, then, within thirty days thereafter, twenty-one members of a new charter convention shall be elected at a special election to be called as above in said city and county, and they shall proceed as above to frame a charter, which shall in like manner and to the like end be published and submitted to a vote of said voters for their approval or rejection. If again rejected, the procedure herein designated shall be repeated (each special election for members of a new charter convention being within thirty days after each rejection) until a charter is finally approved by a majority of those voting thereon, and certified (together with the vote for and against) to the secretary of state as aforesaid, whereupon it shall become the charter of the said city and county of Denver and shall become the organic law thereof, and supersede any existing charters and amendments thereof.''

''Sec. 5. The citizens of the city and county of Denver shall have the exclusive power to amend their charter or to adopt a new charter, or to adopt any measure as herein provided;

''It shall be competent for qualified electors in number of not less than five per cent of the next preceding gubernatorial vote in said city and county to petition the council for any measure, or charter amendment, or for a charter convention. The council shall submit the same to a vote of the qualified electors at the next general election not held within thirty days after such petition is

filed; whenever such petition is signed by qualified electors in number not less than ten per cent of the next preceding gubernatorial vote in said city and county, with a request for a special election, the council shall submit it at a special election to be held not less than thirty nor more than sixty days from the date of filing the petition; *Provided,* That any question so submitted at a special election shall not again be submitted at a special election within two years thereafter. In submitting any such charter, charter amendment or measure, any alternative article or proposition may be presented for the choice of the voters, and may be voted on separately without prejudice to others. Whenever the question of a charter convention is carried by a majority of those voting thereon, a charter convention shall be called through a special election ordinance as provided in section four (4) hereof, and the same shall be constituted and held and the proposed charter submitted to a vote of the qualified electors, approved or rejected, and all expenses paid, as in said section provided.

"The clerk of the city and county shall publish, with his official certification, for three times, a week apart, in the official newspaper, the first publication to be with his call for the election, general or special, the full text of any charter, charter amendment, measure, or proposal for a charter convention, or alternative article or proposition, which is to be submitted to the voters. Within ten days following the vote the said clerk shall publish once in said newspaper the full text of any charter, charter amendment, measure, or proposal for a charter convention, or alternative article or proposition, which shall have been approved by a majority of those voting thereon, and he shall file with the secretary of state two copies thereof (with the vote for and against) officially certified by him, and the same shall go into effect from the date of such filing. He shall also certify to the secre-

tary of state, with the vote for and against, two copies of every defeated alternative article or proposition, charter, charter amendment, measure or proposal for a charter convention.   *   *   *

"No charter, charter amendment or measure adopted or defeated under the provisions of this amendment shall be amended, repealed or revived, except by petition and electoral vote."

It will be observed from the language used in both sections 4 and 5 that the people of Denver were given the exclusive power to amend their charter. Section 5 in substance provides that it shall be competent for qualified electors in number not less than five per cent, etc., to petition the council for any measure or charter amendment or for a charter convention. This is followed with a method as to what shall then be done. As we interpret the language there used, it means that they may petition for *any* amendment; that in the manner used the word "amendment" is unqualified and unlimited, and that they are entitled in this manner to have submitted anything included within the definition of the word "amendment" unless there is something to be found elsewhere in article XX which would tend to limit or confine its meaning to a narrower scope. We have been unable to find anything elsewhere in the article which would tend to sustain such a claim. This limits the question as to whether these two amendments constitute a new charter or whether they are in fact amendments to the existing charter. We are of opinion that they come within the definition of the word "amendment" when unlimited in its scope as here used. Webster's New International Dictionary, 1911 edition, defines the word "amendment" "In public bodies; any alteration made or proposed to be made in a bill or motion by adding, changing, substituting or omitting."

When the former charter is considered in connection

with the changes brought about by these enactments, it is convincing of the facts that they are amendments only. A new charter would be an instrument complete within itself. When these amendments are considered alone they fall far short of such an instrument and will be found to cover but a portion of the questions necessary to be included in a charter for the government of any municipality. For instance, they fail to cover or change the question of the appointment of many appointive officers and employees provided for in other portions of the charter; they fail to make any provisions concerning their duties or for their salaries; such matters as civil service, the fire and police department, the public health, the fiscal management of municipal affairs, finances, public utilities and the control thereof, franchises and public improvements, or, most of them are left untouched with the exception of a few instances where it is provided that a commissioner shall become the head of certain departments which were heretofore in control of certain boards or some elective officer. The charter prior to amendment appeared to cover all questions of municipal government. It consisted of approximately three hundred sixty sections. The two amendments under consideration amend approximately twenty sections, add twenty new sections and repeal about twenty sections, possibly by implication certain paragraphs in some few other sections, leaving approximately three hundred sections untouched and without the greater part of which no charter for any municipality would be anywhere near complete.

It is true that the amendments are, in a way, a departure from the system heretofore provided for the management of the municipality. In this respect, they are different and are new, so far as the number of officials is concerned; but regardless of this they are germane to the subject of municipal government, that is the only proper subject embodied in the charter, and they pertain

to and effect this subject, each covering a separate and distinct branch thereof. This brings them within practically all the definitions of the word "amendment" as defined in all the authorities cited. The fact that in a way they present something new or different in the management of municipal affairs in no way militates against their being amendments. It is common knowledge that commission government in some form, has, within the past few years, been adopted in many cities in the United States, but regardless of this they still continue to be municipalities and their charters pertain only to local self-government. When these changes are analyzed it will be found that the difference is not so great as the term used might imply; for instance, under the old system there were two legislative bodies consisting of about twenty-five members; under the new, but one legislative body consisting of five members. In each instance they are elected by the people. The new body enacts ordinances, etc., the same as the old; in this respect their powers and duties are identical. Under the old system a mayor was elected by the people with a power of veto; under the new system the commissioners elect one of their number as mayor, but without any power of veto. Under the old system certain city offices were created with the incumbents thereof designated to perform the duties pertaining to certain county and precinct offices, as provided by article XX; while under the new system the commissioners are designated to perform the duties pertaining to most, if not all, of these county offices and the number of city offices wherein the incumbents were designated to perform the duties of county and precinct officers has been materially reduced. It will thus be observed that about the only changes of any consequence are the reduction in the number of officials heretofore provided for the management of the city's affairs and the withdrawal from the mayor of the power of veto, but in a way this power

has been vested in three members of the commission, as that number can defeat any proposed legislation.

In *Livermore v. Waite*, 102 Calif. 113, 36 Pac. 424, 25 L. R. A. 512, cited by counsel for plaintiffs in error, it is said, "the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed." This covers the amendments under consideration. The lines of the original instrument cover the question of local self-government for the city and county of Denver. The amendments include such additional changes within the lines of the subject covered by the original instrument, *viz.*, local self-government, as are thought will improve or better carry out the purposes for which it was framed.

By the adoption of article XX to our state constitution, we embodied therein radical changes by consolidating the city and county of Denver and allowing it to designate the persons therein who should perform the duties pertaining to county offices, as well as granting to it the right to make its own charter, a power theretofore resting in the legislature. The validity of this amendment has been sustained.—*People v. Sours*, 31 Colo. 369, 74 Pac. 167, 102 Am. St. 34; *People v. Cassiday*, 50 Colo. 503, 117 Pac. 357.

In *Denver v. Hallett*, 34 Colo. 393, 83 Pac. 1066, as well as in *Londoner v. People*, 52 Colo. 15, 119 Pac. 156, we held that article XX was intended to grant home rule to the city and county of Denver and other municipalities, and to bestow upon them every power possessed by the legislature in making their charter. This being true, if the matter was still in the hands of the legislature and a legislator was drafting the title to a bill concerning this subject, if he followed the repeated suggestions of this court, he would make it broad enough upon the general

subject to include all appropriate matters pertaining thereto. In such case any matter pertaining to local self-government covered in the general title would be germane by way of amendment.

This court, as well as the court of appeals, has repeatedly sustained sundry and different kinds of amendments to the former charter, some of which made radical changes in the management of its affairs.—*Cunningham v. Denver,* 23 Colo. 18, 45 Pac. 356, 58 Am. St. Rep. 212; *In re City of Denver,* 18 Colo. 288, 32 Pac. 615; *Darrow v. People,* 8 Colo. 426, 8 Pac. 924; *Carpenter v. People,* 8 Colo. 116, 5 Pac. 828; *Brown v. City of Denver,* 7 Colo. 305, 3 Pac. 455; *City of Denver v. Barron,* 6 Colo. App. 72, 39 Pac. 989.

It should also be borne in mind that in its method of enacting laws and amendments thereto, the legislature is limited by certain restrictions contained in the constitution. Article V provides that no law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house so as to change its original purpose. Also, that no bill except general appropriation bills shall be passed containing more than one subject, which shall be clearly expressed in its title, but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed. No such provisions are to be found in article XX in providing for initiated amendments to a charter. This is further evidence of the correctness of our conclusion that the word ''amendment'' as therein used was intended to be unqualified and unlimited in its scope.

Article XX authorizes the city and county of Denver to make its charter, which in a sense is its constitution, concerning local affairs; the state constitution provides the method by which it can be amended. This does not

include the restrictions placed upon the legislature in the enactment of laws, or any restrictions other than the word "amendment" would imply. This makes the rules pertaining to amendments to constitutions more applicable to those under consideration, than amendments pertaining to general laws; such being the case, the principles recognized by this court in *Nesbit v. The People*, 19 Colo. 441, 36 Pac. 221, are applicable, wherein Mr. Justice Elliott, in speaking for the court, calls attention to this distinction and the reasons therefor, as follows:

"The power of the general assembly to propose amendments to the constitution is not subject to the provisions of article 5 regulating the introduction and passage of ordinary legislative enactments. A proposed amendment to the constitution need not be restricted, like an ordinary legislative bill, to a single subject; the only restriction is, that 'amendments shall not be proposed to more than one article of this constitution at the same session.' Const., art. 19, sec. 2. It is not essential that the subject of a proposed amendment shall be expressed in its title; a proposed amendment need not have any title except as it designates the article of the constitution to be amended. In changing a proposed amendment to the constitution during its passage through either house, it is not necessary that such change should be printed, nor that the original purpose of the proposed amendment should be strictly adhered to.—*Koehler v. Hill*, 60 Iowa 543.

"Section 2 of article 19 prescribes the method of proposing amendments to the constitution, and no other rule is prescribed. It is not, therefore, by the 'legislative' article, but by the article entitled 'amendments,' that the legality of the action of the general assembly in proposing amendments to the constitution is to be tested. Article 19 is *sui generis;* it provides for revising, altering and

amending the fundamental law of the state, and is not in *pari materia* with those provisions of article 5 prescribing the method of enacting ordinary statutory laws. The distinction is obvious. When an ordinary legislative bill, free from constitutional objection, is introduced and passed by both houses of the general assembly, as provided by article 5, it becomes, when approved by the governor (or without his approval when passed by a two-thirds vote of both houses), a valid and binding law; thus, an act of ordinary legislation is fully and finally consummated, and thus a statutory law is brought into existence, by virtue of the power vested in the legislative department of the government.

"But in proposing an amendment to the constitution, the action of the general assembly is initiatory, not final; a change in the fundamental law cannot be fully and finally consummated by legislative power. Before a proposed amendment can become a part of the constitution, it must receive the approval of a majority of the qualified electors of the state voting thereon at the proper general election. When thus approved it becomes valid as part of the constitution by virtue of the sovereign power of the people constitutionally expressed."

In *Falconer v. Robinson*, 46 Ala. 340, it was held that an act is amended when it is in whole or in part permitted to remain, and something is added to or taken from it, or it is in some way changed or altered to make it more complete or perfect, or to fit it the better to accomplish the object or purpose for which it was made or some other object or purpose.

In *Cantini v. Tillman*, 54 Fed. 969 (C. C.), it is said:

"Nothing is more common than to amend by striking out one section and by inserting another, or by striking out several sections and by inserting one or several; and if it be competent to amend by striking out and insert-

ing one, two, three, four sections, clearly it is competent to strike out all the sections, and to insert others, in *pari materia*. Striking out all after the enacting words, and inserting, is nothing but an amendment, and is governed by the same rules as other amendments." See also *Hammond v. Clark,* 136 Ga. 313, 71 S. E. 479, 38 L. R. A. (N. S.) 77; *Brake v. Callison,* 122 Fed. 722 (C. C.); *State v. Wright,* 14 Ore. 365, 12 Pac. 708.

A proposed change from the commission form to the mayor form was under consideration in *State ex rel Hindley et al v. Superior Court,* 70 Wash. 352, 126 Pac. 920. The city of Spokane had by charter convention adopted the commission form of government; thereafter the requisite number of citizens who desired to go back to the mayor form petitioned the council to call a special election for that purpose; they refused. The court held the method which controlled was provided for in their charter. The portion involved reads:

"This charter may be amended by a majority vote on such amendments. The provisions of this charter, with respect to submission of legislation to popular vote by the initiative, or by the council of its own motion, shall apply to and include the proposal, submission and adoption of amendments."

In that case, as here, it was urged that amendments referred to and provided for in their charter were only such revisory or supplemental changes as the showing of the present charter might suggest, and should not be held to refer to amendments which alter or annul the basic plan or principle upon which the city government was founded. This contention was not sustained. The commissioners who for this reason had refused to call the election were compelled to do so. Without being understood as approving or rejecting all the reasons given, we are of opinion that the conclusion reached by the Wash-

ington court was sound, and that there, as here, where the word "amendment" is used without limitation that any matter which is germane to the principal subject, to-wit, that of municipal government, is proper to be submitted as an amendment. The case of *State ex rel v. City of Portland et al*, 65 Ore. 273, 133 Pac. 62, is also relied upon by defendants in error, but upon account of the difference between their constitution and charter provisions and ours we think it is unnecessary to attempt to apply its principles to the facts under consideration.

In *City and County of Denver et al v. New York Trust Company et al*, 229 U. S. 123, 57 L. Ed. 1101, 33 Supreme Court Reporter 657, the supreme court of the United States sustained the validity of section 264a, which was an amendment to this charter initiated by the people and voted on at the May, 1910, election. This section was in relation to certain public utilities; it created a public utilities commission and designated its first members instead of leaving them to be elected in accordance with the provisions of section 198 of the charter; it also prescribed a different mode of acquiring a municipal water plant than that provided in article IX of the charter. It authorized the issuance of bonds and contains many other provisions upon the water subject. The voter was required to accept or reject it in its entirety; he was given no opportunity to vote for or against its different provisions, or for or against the commissioners named in the act. In commenting upon this subject the court said:

"But it may be added that we think all the provisions of the amendment have such a relation to the principal subject, namely, the public utilities of the city, as to permit their inclusion in a single amendment. Of the other two branches of this objection it is enough to say that the amendment supersedes *pro tanto* the original provisions of the charter with which it is not in accord. The pur-

pose in adopting it was to introduce something new,—to make a change in existing provisions,—and being adopted conformably to the constitutional and charter requirements, the new or changed provisions became at once a part of the charter, thereby supplanting or modifying the original provisions to the extent of any conflict.''

We are not unmindful of the language used in this case which counsel for plaintiff in error claim sustains their contention that this is a new or revised charter. It is:

''In the briefs some reference is made to *Speer v. People,* 52 Colo. 325 (122 Pac. 768), where the supreme court of the state recently had before it a proposed amendment radically and extensively changing the form of the city government. The opinions rendered in the case disclose some differences of opinion upon the question whether what was proposed could be regarded as a mere amendment, but the question was not decided and nothing was said in the opinions that tends to sustain the objection now made to § 264a.''

By this language we do not understand that the question here was under consideration in that case, or that it was meant to intimate that a change could not be made by amendment from the mayor form to the commission form. According to our views the language hereinabove first quoted would indicate that the court was of opinion that such changes could be made, for the reason that in referring to section 264a it states, ''The purpose in adopting it was to introduce something new,—to make a change in existing provisions.'' As we understand it, the object of all amendments is to make changes, something different, or something new, or, to eliminate something if desired.

The contention that the manner of their submission was such as to afford no opportunity to the voters of law-

fully exercising their right of franchise, is not well taken. The claim that the two amendments, by their terms, are made inter-dependent so that neither may be effective unless both are adopted, is not altogether sustained by the record. The adoption of the commission government amendment does not appear to be dependent upon the adoption of the nonpartisan election amendment. It is true that its last paragraph says:

"The foregoing amendment shall not go into effect until at the same election when it is adopted or at some subsequent election an amendment shall be adopted providing for commissioners to assume the duties herein provided for, and designating the time when said commissioners shall take office, and it shall then go into effect when said commissioners do take office."

This means that it shall not take effect until some provision be made for the election of commissioners, and not then until they shall assume the duties of their offices. In this respect this amendment was not self-executing. We do not understand that this fact makes it void.—8 Cyc. 752; *Ex parte Wall*, 48 Calif. 279, 17 Am. Rep. 425.

It is true, as contended, that the adoption of the first portion of the nonpartisan election amendment, *viz.*, that providing for the election of commissioners, was contingent upon the adoption of the commission government amendment; we do not understand that this makes it void *ab initio*.

In Dillon on Municipal Corporations, 5th Ed., Vol. 2, at page 905, it is said:

"Municipal ordinances, otherwise valid, may, like an act of the legislature, be adopted to take effect in future and upon the happening of a contingent event."

In Cooley Constitutional Limitations, 7th Ed., at page 164, the author states:

"But it is not always essential that a legislative act should be a complete statute which must in any event take effect as law, at the time it leaves the hands of the legislative department. A statute may be conditional, and its taking effect may be made to depend upon some subsequent event."

In *State v. Noyes*, 30 N. H. 279, it is said:

"It is not at once apparent that there can be any sound objection to the enactment of laws to take effect upon the occurrence of future events, such as the legislature may prescribe."

In *Pueblo County v. Smith*, 22 Colo. at page 541, 45 Pac. 360, 33 L. R. A. 465, this court said:

"It will be conceded that the powers conferred upon the legislature to make laws cannot be delegated to any other body or authority, except as the principle may be modified by the second maxim. It is, however, not essential that the law should take effect immediately upon its leaving the hands of the legislature. Its operation may, under certain limitations, be made to depend upon a contingency."

To the same effect in principle are: *People ex rel Rhodes v. Fleming et al*, 10 Colo. 553, 16 Pac. 298; *State v. Parker*, 26 Vt. 357; *Bull v. Read*, 13 Grat. (54 Va.) 78; *Burnside v. United States*, 7 Cranch 382, 3 L. Ed. 378; *Peck v. Weddell*, 17 Ohio St. 271.

It is claimed that the form of the ballot violates the provisions of section 179 of the charter which provides that the official ballot shall, by proper words, show the nature of the instrument to be voted on, and shall give to each voter the right to place a cross mark upon his ballot showing clearly his intention to vote for or against any measure, charter amendment, proposal for a charter convention or any ordinance, and, in case any separate

or alternative proposition be submitted the ballots shall be prepared so as to enable the voter to express his intention in regard to each proposition. By this method it was intended that each voter should have the right to vote for or against each measure, charter amendment, or ordinance, or for or against a charter convention. We think the substance of this section was complied with in this respect. The fact that the going into effect of a portion of one of the amendments was contingent upon the adoption of the other, did not make it a noncompliance with this section. Whether when applied to a portion of the one amendment it would be a mere futile and senseless procedure as contended for by counsel, is a matter with which we have no concern. By the adoption of article XX the whole people of the state saw fit to delegate to a very limited number of the inhabitants of the city and county of Denver the power to initiate proposed amendments to their charter. The authorities all seem to hold that the going into effect of such an amendment can be made contingent upon the happening of other events. In case this small per cent of the electors is enforcing futile and senseless proceedings, and will persist in so doing, as counsel argue, the remedy lies with the people to amend the constitution in a manner which will prevent it. This court is not possessed of that power. In *The People v. Cassiday, supra,* in referring to article XX, which grants this privilege, we said:

"It is not only a part of the constitution, but it is there to stay, until the authority which voted it in shall vote it out. It, as any other part of the constitution, is to be given force and effect according to its plain intent, purpose and meaning."

It is claimed that the language upon the ballot submitting the amendment providing for commission form of government is calculated to mislead the voter. An

examination of the ballot when considered with the result of the election shows this contention to be incorrect. The ballot discloses that there were four separate and distinct propositions submitted. The first was for or against a nonpartisan system of election. The second was for or against initiated amendment that gives immediate nonpartisan commission government to the city and county of Denver. The third was for or against the holding of a charter convention to adopt a non-partisan commission form of government for the city and county of Denver. (The validity of such a designation we give no opinion concerning.) The fourth pertains to the property and rates of a telephone company. The electors voted to adopt the first, second and fourth, rejecting the third. It is not contended that the vote upon each was not sufficient to disclose an intelligent expression of the people upon these questions, though the submission clause to the amendment concerning commission government might appeal to us as disclosing a strong partiality for the adoption of that measure, and to a certain extent be unfair in its caption, or was somewhat in the manner of a campaign document, as counsel suggest. It is not alleged that it misled any voter, but to the contrary it stands practically admitted that there was a decided expression by the electors upon all of these questions. This same contention was raised in *People v. Sours, supra,* pertaining to the title under which article XX of the state constitution was submitted, in which case it was said, "There is no proof that any elector was deceived by the title under which the amendment was submitted." Not only is this the case here, but the record shows that 26,842 votes were cast for or against this amendment. This fact, coupled with the absence of any allegation that any elector was deceived or misled by the submission clause, is sufficient to convince us that there is no valid foundation for this contention.

It is claimed that while the form of submission purports to submit only two amendments, there were, in fact, a large number of distinct and separate amendments submitted and voted upon as one amendment.  In this respect great stress is placed upon the argument wherein it is claimed that the two amendments were interdependent, which contention has heretofore been disposed of.  It is claimed that inasmuch as the commission form of government amendment makes regulations concerning the duties of the commissioners as the city council, and provides that the doing of certain things shall be a sufficient cause to declare the office vacant, and that as it eliminates the veto power of the mayor and provides for a reduction in the number of other officers, that these and other matters were separate and distinct propositions upon which the people had a right to express themselves separately.  It is also claimed that the section in the election amendment which changes the time for city elections, and the section which prohibits political parties from naming candidates as such, and the section which increases the term of office of the election commission, are distinct and separate questions upon which the elector had a right to be heard separately.

We are of opinion that the matters above referred to are but incidents to the main objects sought to be accomplished by the amendments.  The commission amendment provides for the commission form of government.  To do this it was necessary to make changes in the charter so as to adapt its provisions to the conditions involved by the change.  This could not be accomplished by declaring that the city and county of Denver should have a commission form of government, consisting of five commissioners, one of whom, selected by themselves, should have the title of mayor.  To obtain the object sought it was necessary to abolish many offices, to create others, and provide their duties, and to make other changes thought necessary in

order to perfect a complete government under the commission system. We are of opinion that the changes referred to were germane to the principal subject and were made as incidents thereto. *In People v. Sours, supra,* it was said:

"That if an amendment embraces more than one subject, said subjects need not be separately submitted if they are germane to the general subject of the amendment, or if they are so connected with or dependent upon the general subject that it might not be desirable that one be adopted and not the other."

If a bill were introduced in the legislature entitled "An act in relation to elections," making a change in the dates thereof, it could not consistently be maintained that it was not covered by the title. We think this rule is applicable here and that the change of the date of election was germane to the election amendment; also, that the portion involving the terms of the election commissioners was germane to this amendment. By other provisions arrangements are made which will ultimately abolish the election commission and substitute in lieu thereof one election commissioner who, with the commissioner of safety and the auditor, will thereafter perform the duties now being performed by the election commissioners. It was necessary to make some arrangements concerning this question; it was but an incident to the main question. As said upon this subject in *Wolfe v. Bronson,* 115 Mo. 271, 21 S. W. 1125: "If all the provisions of the bill have a natural relation and connection, then the subject is single, and this too though the bill contains many provisions." To the same effect is *The State ex rel Hudd v. Timme, Secretary of State,* 54 Wis. 318, 11 N. W. 785, wherein it is said:

"We think amendments to the constitution, which the section above quoted requires shall be submitted sep-

arately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. Tested by this rule, the propositions submitted to the electors contained but one amendment. It is clear that the whole scope and purpose of the matter submitted to the electors for their ratification was the change from annual to biennial sessions of the legislature. It was so spoken of by the legislative bodies which passed it, as well as by the electors who ratified it. To make that change it was necessary, in order to prevent the election of members of assembly, half of whom would never have any duties to perform, that a change should be made in their tenure of office as well as in the times of their election, and the same may be said as to the change of the tenure of office of the senators."

These cases were cited with approval by this court in *People v. Sours, supra,* which is in harmony with the views herein expressed. To the same effect are: *State ex rel v. Allen,* 178 Mo. 555, 77 S. W. 868; *State ex rel v. Riplinger,* 30 Wash. 281, 70 Pac. 748; *City of Eugene v. Willamette Valley Co.,* 52 Or. 490, 97 Pac. 817.

As heretofore stated, it should be borne in mind that the method provided for the adoption of amendments like those under consideration is not confined to the limits prescribed in the constitution for the adoption of amendments to legislative enactments. When this fact is taken into consideration, together with the fact that the going into effect of such amendments can be made contingent upon the happening of some other event, the case of *City of Denver v. Hayes,* 28 Colo. 110, 63 Pac. 311, is not in conflict with the views herein expressed; it involved the

issuance of bonds for eleven distinct and separate purposes having no connection with each other, which, as the court held, made it the submission of that number of distinct and separate questions concerning which it was held that the voter had the right to express his choice separately upon each.    At the election under consideration there were four amendments submitted with the privilege given the voter to exercise his choice for or against each.    According to our views all the provisions in the commission government amendment which have been called to our attention have a natural relation and connection with that subject; likewise all those in the non-partisan election amendment have a natural relation and connection with that subject, making them proper to be thus submitted each as one amendment.    This makes unnecessary any consideration of whether sundry and separate matters having no relation to each other can in this manner be submitted as one amendment.

It is claimed that the call for the election at which these amendments were submitted, was not published for the time prescribed by section 5 of article XX of the constitution and for this reason that the election is void. The date for the election was fixed in an ordinance which was signed by the council and mayor on January 24th, 1913.   This ordinance was published January 25th.   The clerk published the text of the amendments with his call for the election upon January 24th, again on January 31st and also upon February the 7th, making three publications, a week apart, as required by the constitution. But it is claimed that the first publication upon January 24th was a nullity for the reason that the ordinance which fixed the date for the election did not become effective until January 25th, because section 13 of the charter provides that no ordinance shall take effect until published, etc.; that the two publications made thereafter were the only legal ones; that a constitutional provision is manda-

tory and must be strictly followed, hence, these facts make the election void. The fallacy with this contention necessary to consider, is in its assumption that as the date fixed for the election was in an ordinance, that this action by the council in fixing the date was of no force and effect until the ordinance, as an ordinance, was in force. An examination of article XX of the state constitution will disclose that it makes no provisions for the calling of special elections like the one under consideration by ordinance. Section 5 provides that whenever petitions providing for the submission of amendments to the charter, etc., are signed by qualified electors in number not less than ten per cent, etc., with a request for a special election, the council shall submit it at a special election to be held not less than thirty nor more than sixty days from the date of filing the petition, but it does not state that it shall be by ordinance. Section 4 provides that a special election shall be called by ordinance for the election of delegates to the first charter convention. Section 5 provides, first, for the calling of elections at which shall be submitted any measure, charter amendment, or the question of holding a charter convention. It then provides that when the question of a charter convention is carried at such election, that a charter convention shall then be called through a special election ordinance, etc., by providing in both instances that the call for the election, where a charter convention is to be held, must be by ordinance, and omitting it in the same act as to calls for elections like the one under consideration is convincing of the fact that such a requirement was not intended in elections of this kind. Section 179 of the charter does not provide that the call for such an election shall be by ordinance, while section 20 of the charter provides that any measure, charter amendment or proposal for a charter convention may be submitted to a vote of the qualified electors in the manner provided by the constitution, which

it must be conceded would in any event be controlling.
The constitution not having provided that the call for
this election be by ordinance, does the fact that it was
included in an ordinance make the call inoperative and
of no force and effect until the ordinance became effective
as an ordinance? We do not think so. The council was
not charged with the duty of giving notice of the election;
that duty was imposed upon the clerk. Its duty wàs lim-
ited to those matters provided for by article XX of the
constitution and certain provisions of the charter, none
of which provide that the act under consideration be by
ordinance. The call for this election could have been by
resolution or in some other appropriate manner and when
thus provided for it would be effective at once. It is the
act in compliance with the mandate of the constitution,
and not the form, which should be looked to in order to
ascertain if the constitutional requirement has been com-
plied with. The pleadings disclose that the act of the
council in calling the election and fixing the date there-
for, was on or before January 24th, that being the date
it is alleged that the ordinance was signed by the mayor
and council. Such being the case, the allegation that it
was done by ordinance can be treated as surplusage or
considered as immaterial, under the well known rule, that
when a thing is done in compliance with the mandate of
the constitution, the doing of other things in excess of
that requirement in connection with that required can be
eliminated, and need not be considered. This principle
was involved in Nisbet v. The People, 19 Colo. 441, 36 Pac.
221, where the court had under consideration an amend-
ment to the constitution which the general assembly
undertook to propose by bill, it was urged that while this
was unnecessary yet as the general assembly undertook
to submit it in this manner, they were bound to observe
the formalities required in the enactment of laws. The
court held that its statutory character did not effect the

validity of the proposed amendment included therein, since, as the court said, "Amendments may be proposed in any form or manner so long as the requirements of section 2 of article XIX are observed." A case more directly in point is that of *Hellman v. Shoulters,* 114 Calif. 136, 44 Pac. 915, 45 Pac. 1057, where the validity of certain actions of the council, not required to be but which were taken by ordinance, were involved before they became effective as an ordinance. The question and conclusion arrived at as stated in the syllabi are:

"The street law provides a complete scheme of procedure for street work, and the city charter cannot make a different procedure by requiring more or less publication of notice, and a publication of notice of intention to make a street improvement for two days only as provided by the street law, is sufficient, though it be in the form of the publication of an ordinance, which the city charter requires to be published for ten days before it can take effect, the ordinance being equivalent to a resolution so far as the street law is concerned, and being the basis for the two days' notice provided for by that law, whether effective as an ordinance or not."

To the same effect in principle are: *City of Napa v. Easterby,* 76 Calif. 222, 18 Pac. 253; *McEneney v. Town of Sullivan,* 125 Ind. 407, 25 N. E. 540.

It will thus be observed that the constitutional provision pertaining to the publication of the call for this election was in all respects strictly complied with.

Perceiving no prejudicial error, the judgment is affirmed.

*Affirmed.*

Decision *en banc.*

Mr. JUSTICE WHITE and Mr. JUSTICE GARRIGUES dissent.

Mr. JUSTICE WHITE dissenting:

Public duty requires each member of this court to freely speak his own convictions on the questions to be determined in any case, and when one of these members, like myself, has the misfortune to differ in a fundamental respect from the conclusions of the majority, to explain with frankness and undeterred by consequences, the grounds of that difference. In this case the difference extends only to the *manner* of exercising the powers conferred upon the people of the city and county of Denver by article XX of the constitution, and *in no sense as to what those powers are.* There can be no doubt that the constitutional provision mentioned gives to the people of that municipality the fullest measure of self-government, and grants to them every power previously possessed by the general assembly in making, changing and amending its charter. But as the general assembly, in the exercise of the power of making charters for municipalities, including the city of Denver, was limited by the provisions of the state constitution, and was required to follow certain procedure therein prescribed, the people of the city and county of Denver are also limited and required to observe certain modes of procedure in making, changing or amending a charter for that corporate entity. They can neither create the organic law of the municipality, nor change, alter nor amend the same, *except in the manner prescribed or permitted by the organic law of the state.* Indeed, in the exercise of the powers conferred, the people of the municipality are actually and truly the agent of all the people of the state, and can do no act in making a charter, changing or amending the same, except in the manner, at the times, and under the conditions prescribed or permitted in the constitutional provision, which constitutes their power of attorney. Section 4 thereof invests the people of the city and county of Den-

ver with exclusive and continuing power to make, alter, revise or amend their charter.   Section 5 re-grants and reinvests the power so invested by section 4 and invests the citizens of the municipality with the additional power to adopt "any measure."   It also invests them with the power to refer, by petition, any measure passed by the council, to a vote of the qualified electors, and to initiate ordinances by petition.   This language, unmodified by other language of the constitution, would constitute general grants of power, and thereby invest by implication all powers necessary for the exercise of the powers granted, and the people of the municipality would have been at liberty thereunder to prescribe and adopt their own modes of procedure.   But the same sections of the fundamental law prescribe the modes of procedure, except in a few minor matters, whereby the powers granted may be exercised; and it is elementary that where the means for the exercise of granted powers are also given, no other means or different powers can be implied, either on account of convenience or of being more effectual.— Cooley's Const. Lim. (6th ed.) p. 42; *Field v. People,* 2 Scam. (Ill.) 79.

As the mode of procedure prescribed by section 4 in the exercise of the powers there granted, extends only to the adoption of a first charter, and section 5 prescribes the procedure in the exercise of the other powers enumerated in section 4 and reaffirmed in section 5, the adoption of a first charter was a condition precedent to the exercise of the powers granted in section 5.   Indeed, such is, in substance, the mandate of the constitution, for it is provided in section 4 that until the people of the municipality adopt a charter as therein prescribed, the charter and ordinances of the city of Denver as they existed at the time the new municipality was created, should be the charter and ordinances under which the new entity should be governed.   But the power to adopt a first charter was

exercised in March, 1904, and thereby the people of the
municipality subjected themselves to the provisions of
article XX. So the powers involved in the case at bar fall
within those enumerated in section 5, and the legality of
their exercise must be measured by the modes of pro-
cedure therein prescribed or permitted, which includes
by express reference certain of the provisions contained
in section 4. It, therefore, becomes necessary to consider
the two sections together. When so considered there is
found therein a constitutional mandate that a first charter
be formulated by twenty-one taxpayers, elected at large
from the municipality, who shall have been qualified elect-
ors within the limits thereof for at least five years. Fur-
thermore, that any new charter shall be formulated in
like manner by like qualified taxpaying electors. In either
case the formation of a charter or a new charter respec-
tively was, and is, a condition precedent to the right of
the qualified electors within the municipality to vote upon
the approval or rejection thereof. The union of the acts
required to be performed by the several agencies desig-
nated was, and is, essential to impregnate them with life
under the fundamental law. Stating the matter somewhat
differently, it is manifest that while qualified electors,
whether taxpayers or not, and without regard to the
length of time they have been such electors, may petition
the council for a charter convention, and may thereafter
vote upon the adoption or rejection of a charter sub-
mitted, it is only taxpayers of the municipality who have
been qualified electors within the limits thereof for at
least five years that are empowered to frame and submit
a charter. Not so, however, as to the formulating and
requiring the submission of "any measure" or a "char-
ter amendment." This may be done by the required
number of qualified electors, whether taxpayers or not,
and without regard to the length of time they have been

such electors. Therefore, it being provided that a "new charter" can be framed only by taxpaying electors of long residence, while "any measure" or a "charter amendment" may be framed by any elector, it is not conceivable that that which is authorized by the one method may be accomplished by the other. Clearly, there is a marked distinction between what is meant by a "new charter" on the one hand, and "any measure" or a "charter amendment" on the other. While it is not imperatively necessary to determine the exact meaning of the word "measure" as used in the constitutional provision, or whether it is synonymous with "charter amendment" as therein used, it is proper to say that rules of construction require that the two terms be ascribed distinct meanings. It is a cardinal rule in the construction of a law, whether constitutional or statutory, that words shall not be regarded as cumulative or useless, but that every word shall, if possible, be given some meaning. —*McClain v. People,* 9 Colo. 190, 11 Pac. 85. Moreover, it is significant that throughout the constitutional provision the words "amendment" and "convention" are always preceded by the qualifying word "charter,"— that is, "charter amendment" and "charter convention," —while no such adjective is prefixed to the word "measure." Thus it is clearly evident that the word "measure," as therein used, is not in a strict sense a "charter measure." From the society in which the word is found, it would seem that it was intended thereby to cover matters not strictly governmental in their nature, such, perhaps, as entering into contracts and the acquiring and operating public utilities, etc. The conclusion I have here reached, as to the distinction between the modes of amending a charter and of revising it *in extenso,* or making a new one, is fortified by, and in harmony with, the language of the supreme court of the United States in con-

sidering this identical matter in *City and County of Denver v. The New York Trust Co.*, 229 U. S. 123, 143, 33 Sup. Ct. Rep. 657, 666 (57 L. Ed.), where it is said:

"Article 20 of the state constitution, under which the present home-rule charter was adopted, while investing the people of the city (§ 4) with 'exclusive power in the making, altering, revising, or amending their charter,' makes a distinction (§ 5) between the modes of amending it and of revising it *in extenso* or making a new one, the difference being that an amendment may be initiated by petition and directly voted upon and adopted by the electors, while a revised or new charter requires the intervention of a charter convention."

Indeed, it is elementary that when in a constitution one complete method of procedure is prescribed for making a new instrument, and a different procedure for making amendments to the former, the particular method prescribed for enacting an amendment can not be employed in enacting a new instrument. From the use, therefore, of the different terms "amendment" and "new charter," and from the entirely different methods prescribed for molding them into shape, and for their submission, it is inevitable that by "amendment" is meant something substantially less than a "new charter"; and the conclusion is irresistible that the particular method prescribed for molding into shape and submitting "an amendment" can not be employed for molding into shape and submitting a substantially different thing, to-wit, a "new charter." The rule and the reasons therefor are tersely expressed in Jameson on Constitutional Amendments, where, in paragraph 574-c, p. 610, it is said:

"Obviously, as we have before remarked, while it may, without absurdity, be claimed that the maxim *(expressio unius)* operates to prohibit the doing of the *same* thing in a different way from that prescribed by

law, it cannot be claimed to prohibit the doing of a *different* thing in a different way. Now, it is very clear on the face of the constitutional provisions authorizing amendments through the agency of the legislature, as compared with those authorizing the calling of conventions, that the purpose of the former is different from that of the latter; in other words, the thing authorized to be done by the one class of provisions is a different thing from that authorized to be done by the other.''

Having seen that there is a marked distinction between a "new charter" and a "charter amendment," as used in the constitutional provision, it is essential to ascertain what that difference is; and for this purpose one should reason in the light of the constitutional and legislative history of the country. Moreover, in judging of the meaning of the terms it must be remembered that the constitution is not the beginning of law, "but that it assumes the existence of a well-understood system which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes.''—Cooley's Const. Lim. (7th Ed.), pp. 94, 95.

By the common law of America originating with our system of constitutional government, and out of the same necessities which gave the latter birth, a method of organic legislation was early recognized and has been universally followed. That method is to require complete revision, or even alterations of a very thorough character, to be made by conventions expressly chosen for that purpose, and to confine changes therein made by amendments initiated by proposals through other agencies to improvements within the lines of the original instrument. As said in *Livermore v. Waite, Secretary of State,* 102 Calif. 113, 118, 36 Pac. 424, 426, 25 L. R. A. 312:

''The very term 'constitution' implies an instrument of a permanent and abiding nature, and the provisions

contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term 'amendment' implies such an addition or change, within the lines of the original instrument, as will effect an improvement, or better carry out the purpose for which it was framed.''

This distinction is recognized in *City and County of Denver v. New York Trust Company, supra,* where the supreme court of the United States, in upholding, as an amendment to the first charter of the city and county of Denver, a provision pertaining to the acquisition, maintenance and operation by the municipality of a water plant, says: ''It does not alter the form of the city government, or make extensive changes in the existing charter.'' And, further, in speaking therein of *Speer v. The People, etc.,* 52 Colo. 325, 122 Pac. 768, where this court had under consideration the charter provisions involved in the case at bar, that court said that, ''the supreme court of the state recently had before it a proposed amendment radically and extensively changing the form of the city government.''

These distinctions are also recognized by text writers upon constitutional questions. Dodd's Rev. and Amend. of State Constitutions, pp. 261, 262; Jameson on Const. Conventions (4th ed.), 562. Moreover, they are based upon cogent reasons of public policy. As said in *Ellingham v. Dye* (Ind.), 99 N. E. 1, 7: ''The idea of the people thus restricting themselves in making changes in their constitutions is original (in American constitutional government), and is one of the most signal evidences that amongst us liberty means, not the giving of rein to passion or to thoughtless impulse, but the exercise of power by the people for the general good, and therefore always

under the restraints of law." They are intended to prevent injustice and confusion arising from sudden and far-reaching changes in the organic law. Indeed, "The great men who builded the structure of our state in this respect had the mental vision of a good constitution voiced by Judge Cooley, who has said: 'A good constitution should be beyond the reach of temporary excitement and popular caprice or passion. It is needed for stability and steadiness; it must yield to the thought of the people; not to the whim of the people, or the thought evolved in excitement or hot blood, but the sober second thought, which alone, if the government is to be safe, can be allowed efficiency. * * * Changes in government are to be feared unless the benefit is certain.' As Montaigne says: 'All great mutations shake and disorder a state. Good does not necessarily succeed evil; another evil may succeed and a worse.' "—Amer. Law Review, 1889, p. 311. *Ellingham v. Dye, supra.*

The whole people of the state, in formulating and inserting article XX into the constitution, had in mind the lessons of history and were sensible of the dangers of haste and immaturity in organic legislation. They, therefore, imposed upon municipalities operating thereunder the duty of protecting the individual citizen against the evils of hasty and frequent changes in the organic municipal law. The time-honored method of requiring that substantial and far-reaching changes of the organic law be made only through the medium of conventions, thus insuring deliberation and skill in drafting the same, is commanded. Moreover, rules for ascertaining the true intent of the voters are prescribed, to the end that justice may prevail, and that tyranny and imposition, by either majorities or minorities, may not exist. The people of the state perceived that a single amendment to a charter altering a detail in city government might be so propounded directly to the voter as to admit of an intel-

ligent expression of his choice by yea or nay, but to submit, in the same manner, that which is substantially a new charter, embodying a number of fundamental changes and embracing a variety of distinct questions, would be repugnant to the principles of natural justice and violative of well recognized rules. The appreciation of these fundamental principles by the framers of the article is further manifest by the constitutional mandate that a first charter be adopted through the intervention of a charter convention. Clearly, if it was ever intended that so radical a change in the charter of the municipality could be made by amendment as that included in the instruments under consideration in the case at bar, the people of the municipality would not have been precluded from formulating their first charter by means of an amendment to the charter of the city of Denver existing when article XX became effective. Moreover, to permit the substantial revision of a charter, or the substitution of a new one, upon petition and direct vote destroys its organic character for it then becomes subject to be overthrown with the same facility as other legislation. Clearly, the framers of article XX used the term "organic law" of the municipality and the word "amendment" in their true constitutional sense. To ascribe to the word "amendment" as there used an unqualified meaning necessarily abrogates the distinction between a "new charter" and a "charter amendment." This can not be done, in my judgment, without destroying by judicial pronouncement, the effect of express language of the constitution.

Having ascertained that under the constitutional grant of power, to petition for a charter amendment, electors of the municipality are permitted to petition *only* for such an amendment as is *within the lines* of an existing charter, and which does not undermine its fundamental principles or destroy its substantial entirety, I shall proceed to determine whether the so-called amend-

ments under consideration in the case at bar are of that character. Courts, in ascertaining the nature of a written instrument, are governed by its legal effect, regardless of what it may be denominated. A proposal, therefore, the legal effect of which is to destroy all the fundamental principles and the substantial entirety of an existing charter, and substitute therefor a radically different frame of government, is not an amendment in the constitutional sense. Such is the effect of the so-called amendments under consideration. This clearly appears by bringing into juxtaposition the existing charter with the so-called amendments. The former establishes a typical form of representative government, of which the underlying principles and substantial features are: the division of the functions and powers of government into three separate and distinct departments common to constitutional government; the division of the territory of the city and county into wards and precincts with the right of local representation in the legislative body, consisting of two branches requiring independent action, and clothed with the self-protecting power of punishing and expelling its members; a chief executive invested with the veto power, and the recognition of the rights of political parties and the general laws of the state concerning elections, including the nomination of candidates and the form of ballots. On the other hand, the so-called amendments create a form of government known in the United States but slightly, if at all, at the time of the adoption of article XX; destroy the underlying principles theretofore common to representative municipal government; unite the functions and powers of the separate and distinct departments thereof and empower the authorities that impose taxes to collect and expend the same; abolish the right of local representation by wards in the legislative body; annul the veto power invested in the executive; destroy the rights of political parties as such in the nomination

of candidates, and circumscribe the elective franchise by means of the preferential system of voting.

While the so-called amendments are germane to municipal government, they are in no sense germane to, nor *within the lines* of the existing charter: On the contrary, they destroy each and every of the fundamental principles thereof; wipe out, as an entirety, the existing frame of government and substitute therefor another radically different in every substantial respect. The provisions of the existing charter which remain unaffected do not constitute the frame or form of government in any respect. They would necessarily be a part of any charter framed with due regard to the rights of the public. Provisions which would be proper in *any* charter are not the distinguishing features of government, and, therefore, can not be employed as a criterion in determining whether a proposed change is in reality a new charter or an amendment to an existing charter. The distinguishing feature of a charter of a municipality, or of the organic law of a state, is essentially the form and frame of government prescribed therein. The incidental accessories in carrying on government of whatever form are substantially common to all, and do not constitute the characteristics by which they are classified.

I am not impressed with the argument of the majority opinion dealing with amendments to statutes, nor do I conceive that the cases cited in support thereof have any relevancy whatever to the matters here involved. This is clearly so, because of the constitutional provision relating to statutes that every bill shall contain one subject which shall be clearly expressed in its title. Under this provision it is not required that an amendment to an act of the general assembly, to be valid, shall be germane to the subject matter of the act, but only that it shall be germane to the subject expressed in the title thereof.

Now, the charter of the city and county of Denver is the organic law thereof, and constitutes the instrument that may be amended.  That charter, therefore, is the subject of legislation, and a "charter amendment" to it, therefore, to be proper, must be germane to *the* plan or scheme of government therein prescribed.  And herein, to my mind, the majority opinion is most unsound, contrary to authority and far-reaching in its evil effect.  It declares, substantially, that any proposed change in the organic law of the municipality which is germane to *any* plan or scheme of municipal government, constitutes a proposed amendment, and, hence, that by an "amendment" an existing plan of government may be replaced by another entirely different.  If this be true there can be no distinction between a "new charter" and an "amendment" of an existing charter, and the constitutional provisions prescribing a separate mode of procedure in the enactment of each are coalesced.  If any measure germane to the subject of municipal government may be properly classed as an amendment to *any* charter for municipal government, as held in the majority opinion, then an "entire charter" is only an amendment, for it relates to municipal government.  So, in the case at bar. If these so-called amendments had been framed by a charter convention and all of the unrepealed provisions of the existing charter embodied therein, and the entire instrument so framed, designated a charter, it would be, nevertheless, in legal effect, only an amendment.  This necessarily follows, because the majority opinion holds that there is nothing in article XX that limits the meaning of the word "amendment," and that such word, in its broad sense, includes any alteration made or proposed to be made by "adding, changing, substituting or omitting"; and, therefore, an existing charter of a municipal government may be changed by amendment, provided the proposed change relates to the subject of municipal gov-

ernment. Such is the holding of the majority opinion, notwithstanding the organic law of the state has recognized a clear distinction between a charter and a charter amendment, and prescribed different modes of procedure for the enactment of each. I can not give my assent to such reasoning. The word ''amendment'' as used in the constitution is preceded by the word ''charter.'' That, of itself, limits the meaning of the word ''amendment'' so that the subject of municipal government embraced in the word ''charter'' is necessarily confined to the existing charter sought to be amended. To be proper and legal, under the constitutional provisions in question, a charter amendment must be germane, not to *any* plan of municipal government, but to the *specific* thing amended, that is, the existing plan or charter of municipal government. This is why, in *Livermore v. Waite, supra,* it is said, that an amendment to the organic law must be confined to such matters as are *within the lines* of the original instrument, and which do not undermine its fundamental principles or substantial entirety. Such, also, are the considerations which have prompted text writers on constitutional subjects to declare that amendments should be confined to such matters as are simple and do not affect the whole scheme of government.

Authority, by way of analogy, in support of the foregoing views, is found in cases determined by this court dealing with the power of the general assembly to change the charter of the former city of Denver. At an early date it was decided that such charter, as it existed, at the date of the admission of the state, was preserved by the constitution. And therefore, the general assembly did not have power to take away that charter or to make a new one for the municipality, *but did have power to amend the same.* In *Cunningham v. City of Denver,* 23 Colo. 18, 20, cited in the majority opinion, it is said: ''The city of Denver was incorporated under a special

charter in 1861, and the right of cities so incorporated to maintain their corporate existence is recognized by the constitution, while the power of the legislature to amend such special charters is implied from this and other provisions of our state constitution, the only limitation being that only such amendments can be made as are revisory or amendatory thereof." *In re City of Denver,* 18 Colo. 288, 45c Pac. 356, 59 Am. St. 212, also cited in the majority opinion, it is said: that to make an "amendment free from constitutional objection, it must be of such character as to be fairly considered as revisory or amendatory of the charter existing prior to the adoption of the constitution."

While it is true that amendments made by the general assembly to the charter of the city of Denver existing at the time the constitution was adopted, were frequently sustained by this court and the court of appeals, no such amendments destroyed the fundamental principles or the substantial entirety of the existing charter. It may also be true, as said in the majority opinion, that if the matter of legislation for the city and county of Denver now existed in the general assembly it could, by amendment, do that which is sought to be done by the amendments in question. But, however that may be, it does not, in any sense, support the conclusions of the majority, nor militate against my own herein expressed. Municipal corporations emanate only from the people of the whole state, and the entire subject of legislation, whether state or municipal, was invested in the general assembly or reserved in all the people of the state. Therefore, the subject of municipal legislation, until the embodiment of article XX in the constitution, was vested in the general assembly under certain constitutional limitations. Special charters of municipalities organized prior to the adoption of the constitution could be amended but not destroyed. As to other municipalities the power of the

general assembly was supreme. Thus the power to amend charters of certain municipalities existed as well as the power to enact charters for other municipalities and to amend the same. But in the exercise of these powers the constitution made no distinction between the modes of procedure in the enactment by the general assembly, of charters for municipalities, and the enactment of amendments thereto. In either case the powers were vested in the general assembly and it could exercise them only through and by means of a legislative bill containing but one subject and that clearly expressed in its title. It was confined to the same process of procedure, whether enacting a new charter or a charter amendment. Not so, however, as to the exercise of the power vested in the people of the city and county of Denver under article XX. While every power previously possessed by the legislature in making or amending charters for such municipality was bestowed upon the people thereof, the manner of its exercise was changed. In the adoption of a charter they must follow a prescribed procedure entirely different from that which may be pursued in the adoption of a charter amendment. While it is true, as stated in the majority opinion, that no such restrictions as are placed upon the general assembly in enacting legislation are found in article XX in providing for initiated amendments to a charter, nevertheless other constitutional restrictions and provisions equally binding and equally certain are found therein.

The majority opinion concedes the inapplicability of *State ex rel. City of Portland et al.,* 65 Ore., 273, 133 Pac. 62, relied upon by defendants in error, and declines to attempt to apply it to the case at bar. Nevertheless, it seeks to fortify its conclusions by *State ex rel. Hindley et al. v. Superior Court of Washington,* 70 Wash. 352, 126 Pac. 920. In my judgment the latter case is also inapplicable. While it is held therein that sections 82 and 125 of

the Spokane City Charter, authorizing the submission of initiated amendments, do not limit amendments to such as are revisory or prescribe supplemental changes as to the working of the charter adopted, but authorize the submission of amendments providing for return to the system of council form of government, though altering and annulling the basic principle upon which the charter was founded, the holding is based upon the doctrine clearly not recognized in this state,—*In re City of Denver, supra*,—that the classification of amendments is always a political question, to be determined by the people. Moreover, the constitution and laws of the state of Washington, under which that decision was rendered, clearly disclose that the legislative power of the whole state enlarged the meaning of the word "amendment" as applicable to municipal charters, so as to include therein "any matter within the realm of local affairs or municipal business." Art. 11, § 10, Const. of the State of Washington; § 1, Chap. 186, Laws of Washington, 1903, p. 393. Obviously the framers of this law had in mind that the word "amendment" was ordinarily confined to changes within the lines of an existing charter; otherwise, there would have been no necessity for enlarging its meaning as used in the statute beyond its meaning as used in the constitution. So it, perhaps, may be said with propriety that under these provisions of the law of that state the courts had no power to draw a line between amendments, or classify them in any way, as the matter had been determined by the people of the entire state. Not so, however, under the constitution and laws of this state. Clearly article XX, the only expression of the entire people upon the subject, contains nothing that can be so construed. And whatever may be the desire of the people of the city and county of Denver they can not, by charter enactment or otherwise, enlarge or change the meaning of the words written into the fundamental law

by the whole people of the state. That it may be advisable
to change the charter of the city and county of Denver to
the extent contemplated by these proposed amendments
may be true, but, if so, it should be brought about only
through the procedure prescribed by the fundamental
law. Since the adoption of article XX there has never
been a time when the people of that municipality might
not have made any change consistent therewith which
they desired by following the mode of procedure therein
prescribed. But to permit them to deviate from the slow
and orderly process prescribed in the making of such
fundamental changes in the organic law of the municipal-
ity will not justify construction of the constitution which
does violence to its express terms and clear intent.

I adopt the language of Bronson, C. J., in *Oakley v.
Aspinwall,* 3. N. Y. 547, 568, as follows:

"It is highly probable that inconveniences will re-
sult from following the constitution as it is written. But
that consideration can have no force with me. It is not
for us, but for those who made the instrument, to supply
its defects. If the legislature or the courts may take that
office upon themselves, or if, under color of construction,
or upon any other specious ground, they may depart
from that which is plainly declared, the people may well
despair of ever being able to set any boundary to the
powers of the government. Written constitutions will
be more than useless. Believing as I do that the success
of free institutions depends upon a rigid adherence to
the fundamental law, I have never yielded to considera-
tions of expediency in expounding it. There is always
some plausible reason for latitudinarian constructions
which are resorted to for the purpose of acquiring power;
some evil to be avoided or some good to be attained by
pushing the powers of the government beyond their
legitimate boundary. It is by yielding to such influences

that constitutions are gradually undermined and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary, in enlarging the powers of the government, opens the door for another which will be sure to follow; and so the process goes on until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them."

The views I have herein expressed are in conformity with, and supported by the holding of Mr. Justice Gabbert, concurred in by Mr. Justice Garrigues, in *Speer v. People,* 52 Colo. 325, 348, 122 Pac. 768, where this court had under consideration proposed changes in the charter of the city and county of Denver substantially the same as those here involved, except that the former proposal contained certain provisions not embodied in those before us relative to the election and salaries of county and juvenile judges and the establishment and maintenance of a school for dependent children. That learned justice therein held that a new charter can not under article XX be proposed by petition; that the proposed amendment was, in legal effect, a new charter, and that the people of the city and county of Denver had no power to adopt the same, except through the intervention of a charter convention. Moreover, he held that a proposed amendment which embraces several distinct propositions can not legally be submitted as one amendment in such form that it can only be voted for or against as a whole, and that the proposed amendment under consideration was vulnerable

to that objection. While these questions were not determined therein, the majority of the members of the court declining to express an opinion thereon, the reasoning of Mr. Justice Gabbert is so clear and convincing as to greatly augment the force of my dissenting opinion, notwithstanding that he now concurs in the majority opinion herein announced. The value of that support is readily apparent when his views therein expressed are brought into juxtaposition with the majority opinion, containing, as it does, the sole reasons for the court's present holding.

While the other questions involved and determined in this case are fundamental, I shall express no opinion thereon. I have not given them such consideration as would justify me in either approving or disapproving the holdings of the majority in respect thereto. Moreover, if my views upon the main question were adopted by the court, a determination of the other questions would be unnecessary. I am authorized to state that Mr. Justice Garrigues fully concurs in the views I have expressed herein.

Decided November 3, A. D. 1913. Rehearing denied December 1, A. D. 1913.